**Opinion of May 3, 2012 Withdrawn, Motion for Rehearing Overruled, Affirmed and Substitute Opinion filed June 26, 2012.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-11-00034-CV

**RAHUL K. NATH, M.D., Appellant**

**V.**

**TEXAS CHILDREN'S HOSPITAL, Appellee**

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-10826**

## NO. 14-11-00127-CV

**RAHUL K. NATH, M.D., Appellant**

**V.**

**BAYLOR COLLEGE OF MEDICINE, Appellee**

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2006-10826A**

# SUBSTITUTE OPINION

We overrule the motion for rehearing filed by Rahul K. Nath, M.D. in these cases. We withdraw our opinion issued May 13, 2012, and we issue the following substitute opinion in its place.

These are consolidated appeals of two judgments awarding appellees Texas Children's Hospital ("TCH") and Baylor College of Medicine ("Baylor") attorney's fees as sanctions. Appellant Rahul K. Nath, M.D. challenges the sanctions awards on several grounds. In both cases, Nath asserts that the trial court abused its discretion in granting the sanctions because (a) the sanctionable conduct was that of Nath's attorneys, rather than Nath; (b) the motions for sanctions were filed after the trial of the case; (c) the procedural safeguards of Chapter 41 of the Texas Civil Practice and Remedies Code were not provided; and (d) the sanctions were excessive under the circumstances. In the Baylor appeal only, Nath brings two additional issues: (1) the trial court abused its discretion in awarding Baylor its attorney's fees as sanctions because Texas Rule of Civil Procedure 13 and Texas Civil Practice and Remedies Code Chapter 10 are unconstitutionally vague; and (2) the award of $644,500.16 in sanctions to Baylor violates the Excessive Fines clauses of the federal and state constitutions. We affirm.

## BACKGROUND

Nath is a board-certified plastic surgeon specializing in surgical treatment of brachial plexus injuries, which are injuries to the nerves of children occurring during birth. In February 2006, Nath sued Baylor and TCH (under vicarious liability theories), and Dr. Saleh Shenaq for tortious interference with prospective business relations and defamation based on statements allegedly made by Shenaq. These allegedly defamatory statements asserted that Nath (a) was fired from Baylor, (b) performed unnecessary surgeries, (c) was unqualified, (d) was under criminal investigation, and (e) lacked professional ethics and integrity. Nath amended his petition in April 2006, adding two out-of-state defendants, reasserting the same allegations.

2

He again amended his petition in August 2006 after the out-of-state defendants filed special exceptions, providing more details regarding their acts, but keeping the same claims against all the defendants: defamation and tortious interference. The out-of-state defendants also filed special appearances, which the trial court denied. However, these special appearances were reversed on appeal. Nath's dispute with Shenaq was resolved by an agreed order of dismissal with prejudice.

Nath amended his petition again in September 2008[1] to include claims for tortious interference, defamation, negligent supervision, and negligent training against Baylor and TCH only. In this petition, Nath reurged his previous defamation complaints and added that Shenaq and various other Baylor and TCH employees made false and misleading statements to the effect that Nath had left TCH without notice and had disappeared from TCH without leaving a forwarding address.

Nath filed a fourth amended petition in November 2008, alleging the same claims against the same defendants. In this petition, he made the allegations detailed above, as well as alleging that further defamatory statements had been made by specific individuals employed by Baylor or TCH. Nath also detailed several specific examples of alleged tortious interference. He contended that the basis for the "defamation campaign" pursued by TCH and Baylor was dissatisfaction of doctors in the Baylor Obstetrics/Gynecology department concerning Nath's testimony in lawsuits filed against them. He additionally alleged that TCH and Baylor were further motivated to discredit him, damage his reputation, and remove him from their facilities because Nath had discovered that even though Shenaq had become partially or completely blind in one eye after suffering a detached retina in 2003, Shenaq continued to perform surgeries.

In July 2009, Nath filed his fifth amended petition against Baylor and TCH, adding claims for a declaratory judgment and seeking injunctive relief. His claims for a declaratory judgment and injunctive relief were based on his allegations that he had

---

[1] The two-year time lag between these petitions is likely due to the appeal of the special appearances.

3

"become increasingly concerned with the question of whether he ha[d] a duty, as a fiduciary to his current patients, to make any disclosures to them if, in fact, he confirmed that Dr. Shenaq's eyesight [had been] impaired during these surgeries." He further alleged that Shenaq had some type of hepatitis, which would have been "an absolute contraindication to his performing surgery." He stated that when he had sought discovery of information to reveal when Shenaq contracted hepatitis, what form of hepatitis Shenaq had, and whether the disease was active, Baylor and TCH had blocked him from obtaining this information. He sought the following declarations:

> Plaintiff seeks this Court's declaration of his rights, interests, and duties with respect to Dr. Nath's Current Affected Patients and any other of the Eyesight Affected Patients and Possible Hepatitis Affected Patients [operated on by Dr. Shenaq] that are identified to be his current patients. Plaintiff further seeks this Court's declaration of the duties of Baylor and TCH with respect to the Eyesight Affected Patients and Possible Hepatitis Affected Patients. Specifically, Plaintiff seeks this Court's declaration that the information sought by Plaintiff in discovery in this lawsuit is information to which he is entitled and that is necessary for him to understand and fulfill his duties to his current patients as well as a ruling from the Court, after the information is fully disclosed, conforming the extent of disclosure that should be made to his current patients. Plaintiff further seeks this Court's declarations as to Baylor's and TCH's specific duties of disclosure to the Eyesight Affected Patients and Possible Hepatitis Affected Patients as revealed by the discovery and determined by this Court.

His requested injunctive relief was based on his declaratory judgment claim.

In December 2009, TCH a filed a traditional and no-evidence summary-judgment motion addressing all of Nath's claims. Baylor filed a similar motion on January 4, 2010. Nath responded to TCH's summary-judgment motion in March 2010. An affidavit signed by Nath was attached as an exhibit to this response. In this affidavit, Nath repeats and expands upon the factual allegations underlying his fifth amended petition, as well as identifying several of the legal claims asserted in his petition. On April 1, 2010, when the

motions for summary judgment were set to be argued, Nath sought recusal of the trial court judge.[2]

On April 14, 2010, Nath filed an amended petition in which he abandoned all his previous claims and substituted a claim for intentional infliction of emotional distress ("IIED"). In May 2004, TCH and Baylor supplemented their summary-judgment motions to address this claim. TCH's summary-judgment motion was granted on June 18, 2010, but its counterclaims remained pending against Nath. Baylor's summary-judgment motion was likewise granted. TCH nonsuited its counterclaims against Nath on August 12, 2010. The trial court signed an order on August 17, 2010, stating that the previously granted summary judgments became final and appealable on August 12, 2010, the date of TCH's non-suit.

On August 26, 2010, TCH filed a motion to modify the judgment to assess its attorney's fees as sanctions against Nath pursuant to Texas Rule of Civil Procedure 13 ("Rule 13") and Chapter 10 of the Texas Civil Practice and Remedies Code ("Chapter 10"):

> [TCH] prays that the Court grant its Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath and impose monetary sanctions against Nath under Chapter 10 and/or Rule 13 *based on the filing of the intentional infliction of emotional distress claim; the defamation, tortious interference, and negligence claims, and the declaratory judgment claim.*

(emphasis added). The trial court heard the motion for sanctions on September 17, 2010. Without objection by Nath's attorney, the trial court took judicial notice of the court's file, including the motions for summary judgment, the attachments to the motions, and the motion for sanctions with attachments. Nath did not appear or present any evidence at this hearing, although he was not subpoenaed to attend. That same day, the trial court granted TCH's motion to modify the judgment and assess fees as sanctions against Nath. The trial court specifically found that Nath's claims were groundless, that a reasonable

---

[2] This motion was denied on April 29, 2010.

5

inquiry would have revealed that these claims were without factual basis and barred by well-settled, existing Texas law, and that they were filed in bad faith and for an improper purpose. The trial court ordered Nath to pay TCH's attorney's fees in the amount of $726,000, concluding that this amount adequately punished Nath and fairly compensated TCH for defending against the claims. On November 8, 2010, the trial court additionally entered lengthy findings of fact and conclusions of law in support of the sanctions. These findings and conclusions are attached to this opinion in Appendix A.

On September 10, 2010, the trial court severed Nath's proceedings against Baylor from the main case, in which TCH's motion to modify the judgment was still pending. On September 15, 2010, Nath filed a motion for new trial in the severed Baylor case. On September 21, 2010, Nath filed a notice of withdrawal of his motion for new trial in the Baylor case. On October 10, 2010, Baylor filed its own motion to modify the judgment and to assess fees as sanctions against Nath:

> [Baylor] prays that, after hearing, the Court grant its Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath and impose monetary sanctions against Nath under Chapter 10 and/or Rule 13 *based on the filing of the intentional infliction of emotional distress claim; the defamation, tortious interference, and negligence claims; and the declaratory judgment claim.*

(emphasis added). On November 12, 2010, Nath filed a response to Baylor's motion to modify the judgment, alleging that Baylor's motion was untimely, that it was improperly addressed at Nath rather than his attorneys, and that the evidence supporting the motion was legally incompetent.

The trial court heard the sanctions motion on November 12, 2010. Over Nath's objection, the trial court took judicial notice of its file. Nath neither appeared nor offered any evidence at the hearing. On November 19, 2010, the trial court signed its order and modified judgment in the Baylor case, making the same findings as it did in the TCH case, discussed above. The trial court ordered Nath to pay Baylor's attorney's fees in the amount of $644,500.16, concluding that this amount adequately punished Nath and fairly

6

compensated Baylor for defending against the claims. On January 11, 2011, the trial court signed findings of fact and conclusions of law supporting the sanctions, which are included in Appendix A to this opinion.

Nath filed motions for new trial in both cases, which were overruled by operation of law. These appeals timely ensued thereafter.

## ANALYSIS

### A.    Standard of Review and Applicable Law

We review the imposition of sanctions under Chapter 10 of the Texas Civil Practice and Remedies Code under the same standard we review sanctions under Rule 13—abuse of discretion. *See Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam); *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). When a trial court imposes Chapter 10 or Rule 13 sanctions, the ruling should be overturned only when it is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). "The degree of discretion afforded by the trial court is . . . greater when sanctions are imposed for groundless pleadings than when imposed for discovery abuse." *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 827 (Tex. App.—Houston [14th Dist.] 1998, pet. denied).

Chapter 10 provides in pertinent part: "A court that determines that a person has signed a pleading or motion in violation of Section 10.001 may impose a sanction on the person, a party represented by the person, or both." Tex. Civ. Prac. & Rem. Code § 10.004(a). Sanctions under Chapter 10 are authorized if the evidence establishes that a pleading or motion was brought for an improper purpose. *Id.* § 10.001(1). Reasonable inquiry should be made by the party and attorney to ensure that the pleading is not filed to harass, delay, or increase the cost of the litigation. *Id.*

Similarly, Rule 13 provides that, if a pleading, motion, or other paper is filed in violation of the rule, the trial court shall impose an appropriate sanction "upon the person who signed it, a represented party, or both." Tex. R. Civ. P. 13. Rule 13 authorizes

sanctions if the evidence establishes that a pleading is either (1) groundless or brought in bad faith or (2) groundless and brought to harass. Tex. R. Civ. P. 13. Groundless "means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." Tex. R. Civ. P. 13.

## B. Propriety of Sanctions Against Nath Individually

In his first issue in each appeal, Nath asserts that the sanctions were improper because they were imposed against him, rather than his attorneys who were responsible for the pleadings. First, as discussed above, under either Chapter 10 or Rule 13 the trial court may sanction the person who signed the pleading, a party represented by the person, or both. Here, the trial court made specific findings and conclusions supporting both sanctions awards against Nath individually. The trial court concluded as follows regarding the sanctions awarded to TCH:

> In light of Nath's bad faith and improper purposes, as set forth herein; Nath's knowledge of the law as a former legal student; Nath's prior conduct as a litigant in numerous cases; the expenses occurred by [TCH] as a result of the litigation and their reasonable proportion to the amount Nath sought in damages; the relative culpability of Nath, as set forth above; the minimal risk of chilling legitimate activity posed by sanctions here; Nath's ability to pay for the damages he has caused [TCH]; the need for compensation to [TCH] as a result of the damages inflicted upon it in defending against this lawsuit; the necessity of imposing a substantial sanction to curtail Nath's abuse of the judicial process and punish his bad faith and improper conduct; the burdens on the court system attributable to Nath's misconduct, including his consumption of extensive judicial time and resources in prosecuting this case; and the degree to which Nath's own behavior caused the expenses for which [TCH] seeks reimbursement, the Court concludes that [TCH] should be awarded a substantial portion of its attorney's fees to sanction Nath for his conduct.

A similar legal conclusion was entered in the Baylor case.[3]

Second, the record contains a lengthy affidavit signed by Nath, in which he repeats and expands upon the facts and claims asserted in his fifth and sixth amended petitions.

---

[3] As noted above, the trial court's findings of fact and conclusions of law in each case are included in their entirety in Appendix A to this opinion.

8

He specifically references his defamation claims and suggests that he may have a duty to his patients to disclose information regarding Shenaq's health, which is what he attempted to use the Declaratory Judgment Act to discover. The trial court considered this affidavit in determining that Nath took a personal and participatory role in the litigation. Nath changed lead attorneys during the pendency of the litigation, another indicator that he was actively involved in the litigation. Finally, Nath's counsel stated that because Nath was very interested in the depositions of two doctors, his attendance at the depositions was "vital" to help direct questioning of the deponents, indicating his active involvement in the litigation.

All of these factors support the trial court's conclusion that Nath himself engaged in the offensive conduct. We are aware that we are not bound by the trial court's findings of fact and conclusions of law. *See Am. Flood Research, Inc.*, 192 S.W.3d at 583 (so holding in a discovery sanctions case). However, we have reviewed the entire record— twenty-nine volumes of clerk's records in the TCH appeal and three volumes of clerk's records in the Baylor appeal, as well as numerous volumes of reporter's records from various hearings, including the hearings on the motions for sanctions.[4] We conclude that the trial court did not abuse its discretion in finding sufficient evidence that Nath was personally involved in the litigation and assisted in orchestrating the claims and tactics of these lawsuits. *Cf. Softech Int'l, Inc v. Diversys Learning, Inc.*, No. 03-07-00687-CV, 2009 WL 638203, at *6–7 (Tex. App.—Austin Mar. 13, 2009, pet. denied) (mem. op.) (concluding that trial court did not abuse its discretion in assessing sanctions against party where there was evidence that party engaged in offensive conduct). We overrule his first issue in each case.

---

[4] Nath, however, asserts that, at best, the evidence that TCH and Baylor set out in their motions for sanctions equally supports the inference that Nath did, and did not, authorize or ratify the acts or omissions about which they complain in their motions. But a "trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision." *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

**C. Timing of TCH's and Baylor's Motions for Sanctions**

In his second issue in each appeal, Nath complains that the sanctions motions were filed "too late," *i.e.*, after trial of the case. In support of this assertion, Nath relies on cases regarding sanctions for discovery abuse. *See Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993) (orig. proceeding); *Finlay v. Olive*, 77 S.W.3d 520, 525–26 (Tex. App.—Houston [1st Dist.] 2002, no pet.). However, the Texas Supreme Court has upheld an award of sanctions under Chapter 10 and Rule 13 based on a motion for such sanctions filed after entry of a final judgment. *Lane Bank Equip. Co. v. Smith S. Equip., Inc.*, 10 S.W.3d 308, 312 (Tex. 2008) ("[A] motion made after judgment to incorporate a sanction as a part of the final judgment does propose a change to that judgment. Such a motion is, on its face, a motion to modify, correct or reform the existing judgment within the meaning of Rule 329b(g).") Accordingly, Nath's second issue in each case is meritless and is overruled.

**D. Applicability of Texas Civil Practice and Remedies Code Chapter 41**

In his third issue in each appeal, Nath contends that trial court abused its discretion in ordering him to pay sanctions because Nath was entitled to the procedural safeguards found in Chapter 41 of the Texas Civil Practice and Remedies Code. Nath asserts that these procedural safeguards are applicable and were not afforded by the trial court in this case. We note first that Nath waived this argument regarding TCH by failing to present it to the trial court. *See* Tex. R. App. P. 33.1(a)(1)(A); *Sterling v. Alexander*, 99 S.W.3d 793, 797 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Thus, we consider this issue in only Nath's appeal from the judgment and sanctions order in the Baylor case and overrule issue three in the TCH appeal.

In addressing this issue, we must first determine whether the safeguards of Chapter 41 are applicable in this case. Nath asserts that they are:

> Texas Civil Practice & Remedies Code Annotated section 41.001(5) defines "exemplary damages" as "any damages awarded as a penalty or by way of punishment but not for compensatory purposes." On page 2 of its

10

Order and Modified Final Judgment, the trial court expressly states that the award of $644,500.16 was intended both to "punish Nath" and to compensate Baylor College of Medicine. As such, the trial court's award of $644,500.16, in part, constitutes "exemplary damages" under Chapter 41 of the Texas Civil Practice & Remedies Code. Therefore, Dr. Nath was entitled to all of the procedural and substantive protections and safeguards afforded to him by the Texas Legislature in that statute.

(record citations omitted).

By its express terms, Chapter 41 applies to "any action in which a *claimant* seeks damages relating to a cause of action." Tex. Civ. Prac. & Rem. Code § 41.002(a) (emphasis added). In turn, "'[c]laimant' means a party, including a plaintiff, counterclaimant, cross-claimant, or third-party plaintiff, *seeking recovery of damages*." *Id.* § 41.001(1) (emphasis added). Here, Baylor was never a plaintiff, counterclaimant, cross-claimant, or third party plaintiff seeking damages. *See id.* Accordingly, Baylor is not a "claimant" under Chapter 41. Nath has provided no argument or authority to contradict the plain language of the statute, which expressly excludes Baylor from its application. Because Nath has failed to establish that Chapter 41 applies to this case, we overrule his third issue in the Baylor appeal.

## E. "Excessiveness" of Sanctions

In his fourth issue in each appeal, Nath contends that the trial court abused its discretion by ordering Nath to pay monetary sanctions to TCH and Baylor that were excessive under the circumstances presented. Because Nath failed to present this issue to the trial court in his case against TCH, he has not preserved this issue for our review. We therefore overrule Nath's fourth issue in the TCH appeal.

Considering this issue regarding sanctions awarded to Baylor, the Texas Supreme Court in *Low* set out a "nonexclusive list" of factors courts should consider in determining the amount of sanctions, including:

- the good faith or bad faith of the offender;
- the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

11

- the knowledge, experience, and expertise of the offender;

- any prior history of sanctionable conduct on the part of the offender;

- the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

- the nature and extend of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

- the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

- the risk of chilling the specific type of litigation involved;

- the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

- the impact of the sanction on the offended party, including the offended person's need for compensation;

- the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

- the burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs; and

- the degree to which the offended person's own behavior caused the expenses for which recovery is sought.

*Low*, 221 S.W.3d at 620 & n.5.

These factors were considered by the trial court in awarding sanctions to Baylor: Nath's bad faith and improper purposes for filing the lawsuit; Nath's knowledge of the law as a former law student; Nath's prior conduct as a litigant in numerous cases; the expenses incurred by Baylor as a result of the litigation and the reasonable proportion to the amount in controversy; Nath's relative culpability; the minimal risk of chilling legitimate litigation activity posed by sanctions award; Nath's ability to pay for the damages caused by his conduct; Baylor's need for compensation as a result of the damages inflicted upon it in defending against Nath's lawsuit; the necessity of imposing a substantial sanction to curtail Nath's abuse of the judicial process and to punish his bad faith and improper conduct; the burdens on the court system attributable to Nath's misconduct, including his consumption of extensive judicial time and resources in

12

prosecuting this case; and the degree to which Nath's own behavior caused the expenses for which Baylor sought reimbursement. Additionally, as discussed above, these findings are supported by the record. A trial court may assess sanctions based on cumulative conduct throughout litigation. *See Falk & Mayfield L.L.P.*, 974 S.W.2d at 826.

Finally, the trial court reviewed evidence regarding the amount of attorney's fees attributable to Nath's sanctionable behavior. Both Rule 13 and Chapter 10 allow for costs and attorney's fees as a measure of sanctions. Tex. Civ. Prac. & Rem. Code § 10.004(c)(3); Tex. R. Civ. P. 13. Baylor established by affidavit evidence that it spent in excess of $674,000 in defending against Nath's lawsuit and sought $644,500.16 as attributable to Nath's conduct.[5] The trial court assessed sanctions against Nath of $644,500.16, which was supported by the evidence. Accordingly, the trial court did not abuse its discretion in determining the award of sanctions to Baylor, and we overrule Nath's fourth issue.

### F.     Constitutionality of Rule 13 and Chapter 10

In his fifth issue in the Baylor appeal only, Nath asserts that Rule 13 and Chapter 10 are unconstitutionally vague under the Due Process clause of the federal constitution and Due Course of Law clause of the state constitution. *See* U.S. Const. amend. XIV § 1; Tex. Const. art. I, §§ 13, 19. Nath relies on *BMW of North America v. Gore* for the proposition that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." 517 U.S. 559, 574 (1996). He contends that neither Rule 13 nor Chapter 10 specifically details the severity of the penalty that the trial court might impose.

Rule 13 identifies (a) the conduct punishable—filing any fictitious pleading or making statements that are groundless, false, or for purposes of delay; (b) who may be

---

[5] Baylor's affidavit explicitly linked attorney's fees to the claims the trial court determined were groundless and brought in bad faith: defense of Nath's declaratory judgment action and defense of Nath's defamation, negligence, tortious interference, and IIED claims.

sanctioned—the person who signed the pleading, a represented party, or both; and (c) the amount of possible sanctions—any sanctions available under Texas Rule of Civil Procedure 215. Tex. R. Civ. P. 13. In turn, Rule 215.2(b) provides that a court may order as sanctions "reasonable expenses, including attorney fees." Tex. R. Civ. P. 215.2(b)(8). Similarly, Chapter 10 identifies (a) the punishable conduct—signing pleading or motion for improper purpose or without evidentiary support; (b) who may be sanctioned—the person signing the pleading, a represented party, or both; and (c) the amount—the amount of reasonable expenses and attorney's fees. Tex. Civ. Prac. & Rem. Code §§ 10.001, 10.002(c).

Nath provides no authority holding either Rule 13 or Chapter 10 unconstitutionally vague. Both Rule 13 and Chapter 10 require notice and a hearing before sanctions may be imposed. *See, e.g.*, *Worldwide Anesthesia Assocs. Inc. v. Bryan Anesthesia, Inc.*, 765 S.W.2d 445, 448 (Tex. App.—Houston [14th Dist.] 1988, no pet.) (stating that all due process required was notice to the appellant and an opportunity to be heard regarding sanctions); *West v. Northstar Fin'l Corp.*, No. 02-08-00447-CV, 2010 WL 851415, at *12–13 (Tex. App.—Fort Worth Mar. 11, 2010, pet. denied) (mem. op.) (concluding that trial court need only provide notice of a sanctions hearing to comport with due process). Here, Nath had notice that Baylor was seeking sanctions in a specific amount. Before awarding Baylor its attorney's fees as sanctions, the trial court conducted a hearing on Baylor's motion. Under these circumstances, we conclude that Nath's constitutional rights to due process and due course of law were not violated. We overrule his fifth issue.

## G. Excessive Fines Clauses

In issue six in the Baylor appeal only, Nath complains that the sanctions granted to Baylor violate the Excessive Fines clauses of the federal and state constitutions. *See* U.S. Const. amend. VIII; Tex. Const. art. I, § 13. After citing U.S. Supreme Court authority to support the contention that the Eighth Amendment may apply to sanctions, Nath's entire argument regarding this issue is as follows:

14

> The trial court's $600,000+ sanction against Dr. Nath, particularly when considered in conjunction with the same trial court's $700,000+ sanction against Dr. Nath on behalf of TCH, constitutes an excessive fine. It is vastly disproportional to any criminal fine available for comparable conduct, particularly when measured by the yardstick that the conduct in question was committed by Dr. Nath's attorneys, and not Dr. Nath himself.

Nath has provided no authority that the particular sanction at issue here, *i.e.*, the $644,500.16 in attorney's fees awarded to Baylor as a sanction against Nath, is excessive. Although it is undoubtedly a large amount of money, it represents a portion of the attorney's fees actually incurred by Baylor, which were, at the time Baylor filed its motion for sanctions, almost $675,000. Attorney's fees are the "monetary guidepost of the impact of the conduct on the party seeking sanctions and the burdens on the court system." *Low*, 221 S.W.3d at 620. Indeed, this court has upheld sanctions awards in the amount of three times attorney's fees. *See Falk & Mayfield, L.L.P.*, 974 S.W.2d 821, 823–24 ("We hold, therefore, that a trial court may, under appropriate circumstances, impose sanctions under Rule 13 in excess of the costs or expenses incurred by the defendant. Accordingly the trial court's imposition of sanctions for three times the amount of attorney fees was not impermissible *per se*."). Accordingly, we conclude that the sanctions imposed in this case do not violate the Excessive Fines clauses of the federal and state constitutions. We overrule Nath's sixth issue.

### CONCLUSION

In Nath's appeal of the monetary sanctions awarded to TCH, our cause number 14-11-00034-CV,[6] we have overruled Nath's four issues. Similarly, in Nath's appeal of the monetary sanctions awarded to Baylor in our cause number 14-11-00127-CV,[7] we

---

[6] Trial court cause number 2006-10826.

[7] Trial court cause number 2006-10826A.

15

have overruled Nath's six issues. Having overruled all of Nath's issues in both appeals, we affirm the trial court's judgments.


                              /s/          Adele Hedges
                                           Chief Justice


Panel consists of Chief Justice Hedges and Justices Jamison and McCally.

**Appendix: Trial Court's Findings & Conclusions**

CAUSE NO. 2006-10826

P-43
FFCLD

| | | |
|---|---|---|
| RAHUL K. NATH, M.D. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| BAYLOR COLLEGE OF MEDICINE and | § | |
| TEXAS CHILDREN'S HOSPITAL | § | |
| | § | |
| *Defendants.* | § | 215TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law in connection with its Order and Final Judgment Granting Texas Children's Hospital's Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath, dated September 17, 2010 (hereinafter, "Motion for Sanctions"). These findings of fact and conclusions of law relate only to this Court's resolution of Texas Children's Hospital's Motion for Sanctions; they do not address Texas Children's Hospital's traditional and no-evidence motions for summary judgment relating to the claims contained in Rahul K. Nath's Fifth Amended Petition, filed December 30, 2009, or Texas Children's Hospital's traditional and no-evidence motions for summary judgment relating to the claims contained in Rahul K. Nath's Sixth Amended Petition, filed May 24, 2010. With respect to Texas Children's Hospital's summary judgment motions, there are no facts to find, and the legal conclusions have already been stated in the motions and responsive pleadings thereto. *See, e.g., Willms v. Americas Tire Co.,* 190 S.W.3d 796, 810 (Tex. App.—Dallas 2006, pet. denied).

**F I L E D**
Loren Jackson
District Clerk

NOV 0 8 2010

Time: _____
By _____ Harris County, Texas
Deputy

: 06455

18

## FINDINGS OF FACT

*Procedural Background*

1) On February 17, 2006, Plaintiff Rahul K. Nath ("Nath") filed an Original Petition against Baylor College of Medicine ("Baylor"), his former employer; Dr. Saleh Shenaq, his former supervisor; and Texas Children's Hospital, which operated a clinic staffed with Baylor doctors, including Nath and Dr. Shenaq, under an affiliation agreement with Baylor.[1] The lawsuit alleged that Dr. Shenaq and other doctors and clinicians made defamatory statements about Nath that tortiously interfered with his business relations, and sought to hold Texas Children's Hospital and Baylor vicariously liable for the alleged defamatory statements.

2) Two months later, Nath filed a First Amended Petition naming Johns Hopkins University and Dr. Allan Belzberg as additional defendants, based on alleged defamatory statements Dr. Belzberg made about Nath in Dr. Belzberg's capacity as a Johns Hopkins employee.[2] A battle over this Court's jurisdiction over Dr. Belzberg and Johns Hopkins ensued.

3) Nath filed a Third Amended Petition nonsuiting Dr. Belzberg and Johns Hopkins in September 2008.[3] The Third Amended Petition also added negligent supervision and training claims against Baylor and Texas Children's Hospital based on the same facts previously alleged.

4) Nath filed a Fifth Amended Petition on July 23, 2009.[4] In addition to the previously-pleaded claims for defamation, tortious interference, and negligence, the Fifth Amended

---

[1] Plaintiff's Original Petition, filed Feb. 17, 2006.
[2] Plaintiff's First Amended Petition, filed Apr. 28, 2006.
[3] Plaintiff's Third Amended Petition, filed Sept. 2, 2008.
[4] Plaintiff's Fifth Amended Petition, filed July 23, 2009.

2

: 06456

Petition alleged a new cause of action for a declaratory judgment based on alleged health problems of Dr. Shenaq.

5) There have been numerous discovery battles in this case. A partial listing is as follows.

6) On November 18, 2008, Baylor filed a Motion to Compel Oral Deposition and Written Discovery Responses against Nath. On December 10, 2008, Texas Children's Hospital filed a Joinder to Baylor's Motion to Compel. This Court, with The Honorable Levi Benton presiding, held a hearing on those motions on December 10, 2008. At the hearing, Judge Benton indicated that Nath would be required to provide certain information regarding his alleged damages and personal finances.[5]

7) On March 11, 2009, Texas Children's Hospital filed a Motion to Compel Interrogatory Responses and Production of Documents and Joint Renewed Motion to Compel Oral Deposition Responses against Nath. On April 13, 2009, Baylor filed a Renewed Motion to Compel Oral Deposition Responses and Extend Time for Nath's Deposition. These motions again sought production of, among other things, certain financial information from Nath. This Court, with the undersigned judge presiding, held a hearing on these motions on April 17, 2009. At the hearing, and in response to the motions, Nath's counsel nonsuited and dismissed all of Nath's claims for damages for injury to his reputation. Nath's counsel also nonsuited and dismissed his claims relating to the falsity of any statement alleging that there exists or has existed a criminal and/or governmental investigation of Nath.[6]

8) On July 20, 2009, Nath, through his counsel, filed a Supplemental Motion to Compel Against Texas Children's Hospital seeking information related to Dr. Shenaq's health, as

---

[5] Transcript of Dec. 10, 2008 Hearing on Motion[s] to Compel Production, at 10-14, 20-21.
[6] Order on Defendant Texas Children's Hospital's and Baylor College of Medicine's Motion[s] to Compel, dated May 19, 2009.

3

: 06457

20

well as medical records of some of Dr. Shenaq's former patients. On July 23, 2009, Texas Children's Hospital filed a Response to Plaintiff's Supplemental Motion to Compel and a Motion to Compel Oral Deposition Responses and Production of Documents and Renewed Motion to Compel Privilege Log. This Court held a hearing on this motion on July 24, 2009.

9)    On December 30, 2009, Texas Children's Hospital filed its traditional and no-evidence motions for summary judgment with respect to all the claims contained in the Fifth Amended Petition. Baylor filed its traditional and no-evidence motions for summary judgment on January 4, 2010.

10)   On January 13, 2010, Nath's counsel filed an Emergency Motion to Compel Depositions of Samuel Stal, M.D. and Larry Hollier, Jr., M.D., two Baylor employees; an Emergency Motion to Compel Production of E-Documents Against Baylor; and an Emergency Motion to Compel Discovery Responses Against Baylor College of Medicine. On January 20, 2010, Nath's counsel filed an Emergency Verified Motion for Continuance of Defendants' Summary Judgment Hearings and Plaintiff's Corresponding Summary Judgment Response Deadlines. The Court held a hearing on those motions on January 21, 2010. This Court granted Nath's motion for continuance, ordered depositions of Drs. Stal and Hollier, set March 26, 2010, as the deadline for Nath to file responses to the motions for summary judgment, and set the hearing on the summary judgment motions for April 1, 2010.

11)   On March 15, 2010, Nath's counsel filed a Second Emergency Verified Motion for Continuance of Defendants' Summary Judgment Hearings and Plaintiff's Corresponding

4

: 06458

21

Summary Judgment Response Deadlines. On March 19, 2010, the Court held a hearing on the motion and denied the second motion for continuance.

12) Nath's counsel filed his responses to the motions for summary judgment on March 26, 2010.[7] Texas Children's Hospital and Baylor filed timely replies in anticipation of the hearing.

13) Instead of arguing the merits of his response to the motions for summary judgment at the hearing set for April 1, 2010, Nath retained a new attorney, Daniel Shea, who filed a motion to recuse the undersigned judge. Per Texas Rule of Civil Procedure 18a(d), the undersigned judge forwarded the motion for recusal to the administrative judge, who in turn assigned the Honorable Mike Engelhart to hear the motion to recuse. Judge Engelhardt scheduled a hearing on Nath's recusal motion for Monday, April 5, 2010.

14) Nath's attorneys did not attend the scheduled April 5, 2010 hearing on the recusal motion. Instead, Nath's counsel filed a Verified Motion to Recuse Hon. Mike Engelhart.

15) Ultimately, the hearing on the original motion to recuse occurred on April 29, 2010. The motion to recuse was denied.[8]

16) In the interim, Nath's counsel filed a Sixth Amended Petition on April 14, 2010, in which Nath "abandoned" all of his previous defamation, tortious interference, and negligence claims in favor of a claim for intentional infliction of emotional distress ("IIED").[9] In response, Texas Children's Hospital and Baylor drafted another round of summary

---

[7] *See* Plaintiff's Objections to Texas Children's Hospital's Motion for Summary Judgment Evidence and Response to TCH's Motion for Summary Judgment and No-Evidence Motion for Summary Judgment (the "Nath MSJ Response"), filed Mar. 26, 2010.

[8] The sanctions award excludes the fees Texas Children's Hospital incurred in defending the motion to recuse. Texas Rule of Civil Procedure 18a(h) requires sanctions for such motions to be heard by the judge hearing the motion to recuse.

[9] Plaintiff's Sixth Amended Petition, filed Apr. 14, 2006; Transcript of June 18, 2010 Hearing on Motions, at 41:5-41:17 (attached as Exhibit B to TCH's Motion for Sanctions).

5

: 06459

judgment motions addressing the new claim.[10] Nath's counsel filed no written responses to these motions, and instead chose to object to the notice of hearing based on a technical argument that Defendants' notice was improper because it was electronically signed (despite the fact that the rules specifically permit electronic signatures).[11]

17) On June 18, 2010, this Court heard argument on, and granted, all of Defendants' motions for summary judgment. Counsel for all parties were present. This Court dismissed all of the claims asserted against Texas Children's Hospital and Baylor in Plaintiff's Fifth and Sixth Amended Petitions.

18) On August 12, 2010, Texas Children's Hospital nonsuited its claims against Nath for statutory attorney's fees based on the Uniform Declaratory Judgments Act, Section 37.009 of the Civil Practice and Remedies Code; and the Texas Medical Practice Act, Section 160.008(c) of the Texas Occupations Code.

19) On August 26, 2010, Texas Children's Hospital filed a Motion to Modify the Judgment to Assess Fees As Sanctions Against Plaintiff Rahul K. Nath. Nath retained another new attorney, Susan Norman, who wrote to the Court on August 21, 2010 asking for additional time so that another new attorney retained by Nath, Scott Rothenberg, could review the file in order to determine the time frame for completing a response to the motion. On September 3, 2010, Nath's counsel filed Special Exceptions to the Motion for Sanctions. Both parties noticed hearings on these matters for September 17, 2010.

---

[10] While Nath abandoned his previous claims by filing the Sixth Amended Petition, his IIED claim against Texas Children's Hospital remained predicated upon his establishing an agency relationship between Texas Children's Hospital and Baylor. Texas Children's Hospital addressed this agency theory (and other dispositive points of law) in its initial motions for summary judgment. For that reason, Texas Children's Hospital filed a supplemental motion for summary judgment incorporating its previously-filed motions.

[11] Objection to Notices, filed June 18, 2010.

6

: 06460

20) On September 17, 2010, the Court held a hearing with counsel for Nath and Texas Children's Hospital in attendance. The Court first heard argument on Nath's Special Exceptions to Texas Children's Hospital's Motion for Sanctions, and overruled the Special Exceptions. The Court then heard argument on Texas Children's Hospital's Motion for Sanctions. The Court granted sanctions for the reasons set forth herein.

*Relevant Factual Background to the Litigation*

21) The underlying litigation arose out of a dispute primarily between Nath and Baylor, his former employer. Nath started his employment with Baylor in 1996 as an Assistant Professor in the Department of Surgery, Division of Plastic Surgery.[12] In 1997, Baylor granted Nath a joint primary appointment in the Departments of Surgery and Neurosurgery.[13] During his time at Baylor, Nath was accountable to and reported to Dr. Shenaq, the Chief of Baylor College of Medicine's Division of Plastic Surgery.[14]

22) It is undisputed that Nath was never an employee of Texas Children's Hospital. Texas Children's Hospital and Baylor are two separate entities, though the two have been affiliated since at least 1962.[15] Though not an employee of Texas Children's Hospital, like hundreds of other doctors, Nath was granted privileges to see patients and operate on patients at Texas Children's Hospital.[16] Much of Nath's practice at Texas Children's Hospital took place in

---

[12] Texas Children's Hospital's Motion for Summary Judgment (the "TCH Traditional MSJ"), filed Dec. 30, 2009, Ex. I at 17:3-13.

[13] *Id.*, Ex. CC at BCM 01594-01595.

[14] *Id.*, Ex. CC at BCM 01595.

[15] *Id.*, Ex. M. Under the Affiliation Agreement, Texas Children's Hospital and Baylor agreed "to cooperate in good faith" to advance medical service through professional care of the sick, to facilitate training of medical and ancillary personnel, to advance medical knowledge through investigation, and to promote personal and community health. *Id.*, Ex. M at TCH-0032. The parties also agreed that each would "retain all jurisdictional powers incident to separate ownership." *Id.*, Ex. M at TCH-0030-0031.

[16] *See id.*, Ex. 2 at 10:22-12:9.

7

: 06461

the Brachial Plexus Clinic (the "Clinic"), where patients were treated twice weekly by an interdisciplinary team of Baylor doctors.[17]

23) In 1996, the Baylor doctors staffing the Clinic included Dr. Rita Lee (a neurologist and the appointed chief of the Clinic); Dr. Shenaq (head of plastic surgery at the Clinic); Nath (as a member of the plastic surgery team); Dr. John Laurent (the primary neurosurgeon for the Clinic); and Dr. Aloysia Schwabe (a physical medicine and rehabilitation physician).[18] The staff at the Clinic also included Lisa Thompson, a Baylor employee, and Lisa Davis, a Texas Children's Hospital employee.[19]

24) Dr. Shenaq and Nath contracted with the Pediatric Consultants of the Department of Pediatrics, Baylor College of Medicine, to collect patient fees related to their practice at the Clinic.[20] After 15% of the collections were distributed to Baylor and the Department of Pediatrics at Baylor, the remaining 85% was split equally between Dr. Shenaq and Nath as partners.[21] None of these fees were divided or shared with Texas Children's Hospital.[22]

25) Starting in late 2003, Nath's relationships with his fellow doctors and clinical workers began to sour. A number of doctors lodged complaints about Nath, including Dr. Lee and Dr. Gurpreet Dhillon, Dr. Arturo Armenta, and others. Those complaints are detailed in the pleadings and other papers filed in this case.

26) In June, the conflicts among Nath and other Baylor physicians came to a head. On June 2, 2004, Dr. Brunicardi and Dr. Robert Grossman, Chairman of the Department of

---

[17] *Id.*, Affidavit of Mark W. Mullarkey ("Mullarkey Affidavit") ¶ 3.
[18] *Id.*, Mullarkey Affidavit ¶ 3.
[19] *Id.*, Mullarkey Affidavit ¶ 3; *Id.*, Ex. 10 10:25–11:19.
[20] TCH Traditional MSJ, Ex. L at BCM 00576.
[21] *Id.*, Ex. L at BCM 00576.
[22] CITE

8

: 06462

Neurosurgery, sent a letter to Nath notifying him of Baylor's decision not to renew his appointments in the Departments of Surgery and Neurosurgery.[23] Accordingly, the letter informed Nath that his last day of employment with Baylor would be June 30, 2004.[24] Although Baylor had a policy setting forth a procedure for non-tenured faculty to complain of grievances, Nath did not file a grievance.[25]

27) In response to his termination. Nath engaged the services of an attorney to communicate with Baylor on his behalf.[26] On June 8, 2004, David Bond, as attorney for Nath, sent a letter to the Deputy General Counsel for Baylor. In the letter, Nath—through Mr. Bond—complained that Dr. Shenaq had told Nath's colleagues that "Nath had been terminated for misconduct."[27] One week later, in another letter from Mr. Bond, Nath complained generally about "disparaging" remarks by Dr. Shenaq; surgery scheduling practices; and a message on an online message board allegedly posted by Dr. Lee.[28]

28) In June/July 2004 Nath incorporated the Texas Nerve and Paralysis Institute, where he continued to practice his brachial plexus subspecialty.[29]

29) In April 2004, in the wake of the complaints of Dr. Lee, Dr. Armenta, and others, a subcommittee of the Medical Executive Committee of Texas Children's Hospital commenced a confidential and privileged peer review of the Clinic.[30] Then, in late 2004. Baylor suffered a loss in the deaths of two brachial plexus physicians, Drs. Lee and Laurent.

---

[23] *Id.*, Ex. A.
[24] *Id.*, Ex. A.
[25] *Id.*, Ex. 2 at 141:18–143:1.
[26] *Id.*, Ex. 2 at 60:24–61:16.
[27] TCH Traditional MSJ. Ex. J.
[28] *Id.*, Ex. D.
[29] *Id.*, Ex. 2 at 54:1–56:9.
[30] *Id.*, Ex. 4 at 62:23–63:4, 66:1–14, 67:8–13.

9

: 96463

26

30)    In light of these losses and the information ascertained in the confidential investigation, Dr. Feigin explained in a letter dated December 13, 2004, that the Clinic operations would be "suspended until TCH [could] ensure the availability of a team of pediatric subspecialists to provide a thorough, multidisciplinary review for all Clinic patients."[31] The Clinic has not reopened since. In the interim, both Drs. Shenaq and Feigin passed away.

31)    In contrast, Nath's private medical practice flourished. Nath admitted he performed at least 800 to 900 surgeries in the four years between the opening of his private practice in July 2004 and his deposition in September 2008.[32] Nath's accountant has represented that Nath earned taxable income "in the low to mid seven figure range" in 2004, 2005, and 2006, income sufficient to enable him to purchase a home costing in excess of $8 million in Houston's Shadyside neighborhood.[33] Nath's former office manager, Brenda DeVaul, testified that by November of 2006, Nath had taken in gross receipts of $6 million for the year.[34] According to Ms. DeVaul, Nath bragged that "There's no other doctor[] in the world, one doctor in a practice, that would make $6 million ... in a year."[35]

32)    Although the Brachial Plexus Clinic was closed and a moratorium was placed on all surgeries related to brachial plexus injuries, Dr. Nath retained his privileges to practice at Texas Children's Hospital.[36]

---

[31] *Id.*, Ex. X.
[32] *Id.*, Ex. 1 at 15:3–19.
[33] TCH Traditional MSJ, Ex. Y at NATH 000117, 000126.
[34] *Id.*, Ex. 5 at 24:23–25:11.
[35] *Id.*, Ex. 5 at 25:8–26:5.
[36] *Id.*, Ex. 4 at 51:20–52:2.

10

: 06464

33) In June 2009, as part of its credentialing process, Texas Children's Hospital learned that Nath was actively being investigated by the Texas Medical Board, and that the board's Executive Director had assigned staff authorized to pursue legal action against Nath.[37] On June 11, 2009, Texas Children's Hospital requested additional information from Nath related to these Texas Medical Board investigations, as well as copies of any documents he may have received from the board.[38] In response, Nath resigned his privileges at Texas Children's Hospital[39] and refused to provide additional information about the Texas Medical Board investigations.[40]

34) On August 28, 2009, the Texas Medical Board filed a public complaint about Nath seeking revocation of his medical license.[41] The complaint alleges that Nath ordered MRI scans of twenty children during the period 2002 through 2005.[42] The Texas Medical Board claims that, despite the poor quality of these images, Nath inappropriately billed the patients for performing and/or interpreting the MRI exams, creating MRI reports that were inaccurate and describing pathology that could not possibly be seen.[43] In addition, the complaint alleges that Nath performed unproven procedures and charged excessive fees—in one instance, $25,500 for a 17-minute procedure (amounting to a rate of $1,500 per minute).[44] Nath has since filed suit against two members of the Texas Medical Board, alleging that the board's adherence to statutory procedures violates his constitutional rights.

---

[37] See id., Ex. EE (stating that four investigations were pending against Nath).
[38] Id., Ex. AA.
[39] See TCH Traditional MSJ, Ex. Z (resigning privileges on July 3, 2009).
[40] Id., Ex. BB.
[41] Id., Ex. V.
[42] Id., Ex. V at 2.
[43] Id., Ex. V at 2.
[44] Id., Ex. V at 2.

11

: 06465

*The Sanctions Hearing and the Court's Judicial Notice of the Case File*

35) Texas Children's Hospital noticed a hearing on the Motion for Sanctions on September 9, 2010, and faxed the notice to Mr. Shea.[45]

36) As discussed above, the Court held an oral hearing on the Motion for Sanctions on September 17, 2010.

37) At the September 17, 2010 hearing, the Court took judicial notice of the entire file in this case, without objection from Nath's counsel.[46] As a result of the judicial notice, the entire case file, including all pleadings, hearing transcripts, filings, motions, responses, replies, and exhibits and attachments thereto, were considered in connection with the Motion for Sanctions.[47]

38) At the September 17, 2010 hearing, Nath's counsel was presented with the opportunity to rebut the evidence in the case file about his conduct and motives throughout this litigation. His counsel declined to present any rebuttal evidence. Nath did not provide any testimony regarding his good faith. As a result, the evidence of Nath's bad faith conduct was unrebutted.

39) The Court finds that, as set forth below, all the evidence necessary to sanction Nath is before the Court. In support of the Motion for Sanctions and Texas Children's Hospital's Response to the Special Exceptions, Texas Children's Hospital cited to at least fifteen filings in this case, three transcripts from hearings in this case, at least four exhibits, and two depositions, including at least seventeen references to Volumes I and II of Nath's

---

[45] Notice of Hearing, filed Sept. 9, 2010.
[46] Transcript of Sept. 17, 2010 Motion Hearing at 8:6–9:7.
[47] With respect to the pleadings, motions, and responses, and replies, the court took judicial notice that they had been filed in the case, but did not take judicial notice of the truth of the allegations therein.

12

: 06466

deposition.[48] Sanctions against Nath are further supported by his affidavit, of which the Court has taken judicial notice, for the reasons set forth below. Finally, the Court has witnessed much of this behavior firsthand. The assessment of sanctions is based on Nath's improper purposes in filing the pleadings in this case; the lack of any factual predicate for his claims, as previously established by the Court's orders granting the motions for summary judgment; and the bad faith that his actions manifest.

*The Court Repeatedly Made It Clear that Nath Had No Standing or Grounds to Assert Issues Related to Dr. Shenaq's Health, Yet Nath Continued In Bad Faith to Press these Issues for Personal Financial Gain, an Improper Purpose*

40)     On several occasions, Nath, through his counsel, sought privileged and confidential information about Dr. Shenaq's health and the medical records of Dr. Shenaq's former patients. Nath's counsel claimed that Nath had a fiduciary duty to those patients to discover who they were, to discovery whether Dr. Shenaq had health issues, and to inform them of Dr. Shenaq's alleged health issues, if they existed. Nath's counsel also tried to tie these discovery requests to his claim for declaratory judgment based on statutory duties to report medical misconduct to the Texas Medical Board. As set forth below, this Court repeatedly indicated that Dr. Shenaq's health was irrelevant to this lawsuit, and that issues related to Dr. Shenaq's health and the identity of his patients were best adjudicated before the Texas Medical Board in proceedings designed to protect the confidentiality of patient medical records.

41)     Nath's bad faith and improper purpose in seeking Dr. Shenaq's health information and the medical records of his former patients is clear. On June 26, 2009, the eve of a

---

[48] Nath's deposition was taken in two parts because he walked out of the first deposition when he became irritated by questions about his earnings and alleged lost profits. TCH Traditional MSJ, Ex. 1 at 22:18–25:9, 27:23–28:16.

13

: 06467

mediation in this case, Nath sent a letter threatening Texas Children's Hospital with the consequences of failing to settle his claims:

> In the event that Dr. Shenaq did indeed have chronic active hepatitis B or a similar form of hepatitis, this would have been an absolute contraindication to his performing surgery. If this is the case, the sheer number of potentially affected patients would be substantial, given Dr. Shenaq's numerous years at Baylor and TCH. Moreover, the risks to each of these patients would be dire and would most certainly require prompt actions to notify patients so that they can undergo immediate testing and obtain legal counsel to advise them of their rights.
>
> . . .
>
> In summary, Dr. Nath is quite anxious to not only give his testimony but also to move forward with the entire discovery process (including numerous depositions) so that the truth can be made known. Dr. Nath also looks forward to confirming that all of the patients (and their parents, if they are minors) that may have been affected by the improper conduct described above have been notified so that they may have the opportunity to obtain the necessary medical testing and treatment as well as to determine what legal actions may be available to them or their children.[49]

It is clear to the Court from this letter, and from Nath's conduct in seeking discovery of Dr. Shenaq's health information, that the claims about Dr. Shenaq's health had nothing to do with any defamation of Nath, or any concern for Nath's fiduciary or statutory duties. The purpose of the discovery was to leverage a settlement.

42)     At the July 24, 2009 hearing on one of Nath's motions to compel, in response to the suggestion that the Court should order production of information identifying Dr. Shenaq's former patients so that Nath could inform the patients of Dr. Shenaq's alleged health problems, this Court stated:

> I can't do that. You can't do that. The State Medical Board could do that. Hospital Board, someone else. Somebody that's not here can do that. . . .

---

[49] Letter from Bruce M. Flowers to Patrick W. Mizell dated June 26, 2009, at 7 (attached as Exhibit A to Texas Children's Hospital's Response to Plaintiff's Supplemental Motion to Compel Dated July 20, 2009, filed July 23, 2009).

14

: 06468

31

> You should be before some other board that has a different authority than me. It shouldn't be used as a tool in your litigation. . . .
>
> I'm wondering why you're asking me to uncover [Dr. Shenaq's alleged health issues and patients allegedly at risk] instead of the State Medical Board. That's my big issue with your approach to it. . . .
>
> You're coming to me asking me to blow open this cover. When there is an agency out there that is well situated to deal with all of the [privilege] issues that you are raising . . . .[50]

This Court also pointed out that Nath could find out directly from his own patients if they had seen Dr. Shenaq.[51]

43) At a hearing on another of Nath's motions to compel on January 21, 2010, this Court stated, in response to Nath's attorney's request for information that related to Dr. Shenaq's health:

> I think—I answered that by saying Dr. Shenaq's condition is not in this suit. . . .
>
> I think I was very clear about it last time. If I wasn't, I want to be clear now. . . .
>
> And I think you're misunderstanding what I ruled last time, and that's why I want to reiterate. . . .
>
> I said it's not relevant to this lawsuit. . . .
>
> It's irrelevant to your lawsuit so it's not your job to do it. Your doctor has an obligation to report it to his medical board and they have a job to do. We don't.[52]

44) Despite these rulings, Nath continued to seek information regarding Dr. Shenaq's health. For example, with Nath present, Nath's counsel repeatedly sought to ask Dr. Samuel Stal

---

[50] Transcript of July 24, 2009 Hearing, at 16:19–17:1, 21:15–18, 48:11–18.

[51] Transcript of July 24, 2009 Hearing, at 17:15–21:10.

[52] Transcript of January 21, 2010 Hearing on Plaintiff's Motion for Continuance, at 42:7–8, 42:15–16, 42:25–43:1, 51:21, 52:6–9 (attached as Exhibit C to TCH's Motion for Sanctions).

15

: 06469

about Dr. Shenaq's alleged health issues during Dr. Stal's deposition.[53] It appears that Nath was also interested in obtaining information about Dr. Shenaq's alleged health issues from the deposition of Dr. Larry Hollier.[54]

45)    On March 25, 2010, Nath submitted a verified affidavit in support of his response to Texas Children's Hospital's motion for summary judgment. In the affidavit, Nath goes to great lengths to describe Dr. Shenaq's alleged vision issue, and lists 45 patients whose surgeries he alleges may have been negatively affected by Dr. Shenaq's eyesight.[55]

46)    Based on the Court's observations at the hearings, Nath's allegations and affidavit, Nath's settlement demand, and the totality of the record, it is clear, and this Court finds as a matter of fact, that Nath was seeking to improperly use the alleged health problems of Dr. Shenaq for Nath's own financial advantage in a case where Nath had no standing to assert claims on behalf of Dr. Shenaq's patients and no legally cognizable basis for his own claims. Dr. Shenaq's health, and its possible effects on Dr. Shenaq's patients, have nothing to do with Nath and this litigation. Nath's improper attempt to use this information as a tool to extract a financial advantage in litigation where his claims had no factual merit is bad faith conduct, and this Court finds it to be sanctionable.

*Nath's Personal Involvement in the Litigation*

47)    Having observed the arguments of Nath's counsel in hearings throughout the course of this litigation, reviewed the filings of his counsel, and reviewed the evidence submitted with the various filings, including Nath's deposition and his verified affidavit submitted in response

[53] Mar. 3, 2010 Deposition of Dr. Samuel Stal (the "Stal Depo.") at 219:14–24; 249:2–23 (attached as Ex. 22 to Plaintiff's Response to Baylor College of Medicine's Motion for Summary Judgment and No-Evidence Motion for Summary Judgment, filed March 25, 2010).
[54] Transcript of Mar. 19, 2010 Hearing on Motion for Continuance, at 28:20–29:4, 31:1–8, 32:10-15. The Court granted an order compelling Dr. Hollier's testimony, but the deposition was postponed by Nath after Dr. Hollier expressed his preference to obtain independent counsel before proceeding.
[55] Affidavit of Rahul K. Nath, M.D., at ¶¶ 7, 21-23, 41-43, and Exhibit 1-B thereto (Mar. 25, 2010) (attached as Exhibit 1 to Plaintiff's Response to TCH's Motion for Summary Judgment, filed Mar. 25, 2010).

16

: 06470

33

to Texas Children's Hospital's motion for summary judgment, this Court finds as a matter of fact that Nath has taken a personal, participatory role in this litigation. Throughout the course of this litigation, and even before suit was filed,[56] Nath has been actively involved in prosecuting his grievances against Baylor and Texas Children's Hospital.

48) This Court finds that Nath is knowledgeable about the law and legal issues, having previously studied the law.[57]

49) Nath's signed and verified affidavit, submitted in support of his Response to Texas Children's Hospital's Motion for Summary Judgment, incorporates virtually the entire contents of his Fifth Amended Petition and expands on the theories set forth in the Petition.[58] This document indicates that Nath fully authorized, adopted, and ratified the facts and theories set forth in his petitions and pursued by his counsel.

50) The record reflects that Nath himself was highly focused on gathering evidence of Dr. Shenaq's alleged wrongdoing. Nath's counsel insisted on delaying trial so that Nath could be present at the depositions of Drs. Stal and Hollier, despite his busy medical practice.[59] According to his counsel, Nath's attendance was "vital" to help direct questioning of the deponents.[60] The deposition requests were based on Nath's understanding of the probable deposition testimony.[61] Nath's counsel stated that "he's been asking me for [] months" for the depositions of Drs. Stal and Hollier.[62] As set forth above, Nath was interested in these

---

[56] *See, e.g.,* TCH Traditional MSJ, Exhibits D, J.

[57] Sept. 30, 2008 Deposition of Rahul Kumar Nath, M.D., Volume 1 at 8:23–9:7 (attached as Exhibit E to TCH's Motion for Sanctions).

[58] Affidavit of Rahul K. Nath, M.D (attached as Exhibit 1 to Plaintiff's Response to TCH's Motion for Summary Judgment, filed Mar. 25, 2010).

[59] *See* Jan. 21, 2010 Transcript at 53:22–25; 56:7–57:4.

[60] *Id.* at 56:7–57:4.

[61] *Id.* at 46:21–47:6.

[62] *Id.* at 56:7–11.

17

: 06471

34

depositions primarily because of the advantage he believed he could gain from whatever the deponents might say about Dr. Shenaq.

51) The Court also finds that Nath personally met with at least one witness who was an employee of Baylor to discuss the witness's testimony. Nath's counsel conceded at the hearing on March 19, 2010, that Nath spoke with Dr. Hollier just prior to Hollier's deposition.[63] While this conversation with a party represented by counsel may not, in and of itself, have been improper, it is further evidence of Nath's personal involvement in this litigation.

52) The Court does not believe that Nath's attorneys alone, without Nath's knowledge, pursued the outrageous effort to use Dr. Shenaq's medical history and former patient records as a tool to further Nath's financial interests in this baseless litigation. Based on the record, it is obvious to the Court that Nath had a hand in the groundless and abusive litigation strategy.

53) Further, the Court finds that this case is part of a pattern in which Nath has used the court system to intimidate adversaries and to stifle dissent with baseless legal allegations. Nath has sued Dr. Belzberg and Johns Hopkins in Maryland court; his former partner in an MRI venture; and his former partner Dr. Shenaq. Nath has asserted claims in federal court in connection with the purchase of his home. Most recently, Nath sued two individuals associated with the Texas Medical Board, which is seeking to revoke his license to practice medicine.[64]

---

[63] Transcript of Mar. 19, 2010 Hearing on Motion for Continuance, at 28:20–29:24, 31:1–19.
[64] Nath's service as a professional witness in hundreds of medical malpractice cases involving brachial plexus injuries further calls into question his credibility. In these cases, Nath purports to disclaim any obstetrical expertise but nonetheless opines that the obstetrician negligently caused the injury. He charges up to $2,500 per hour for such testimony. In evaluating whether to levy sanctions, a court should consider "the credibility of the party or attorney against whom sanctions are requested." *Campos v. Ysleta Gen. Hosp., Inc.*, 879 S.W.2d 67, 71 (Tex. App.—El Paso 1994, writ denied).

18

: 06472

*Texas Children's Hospital's Attorney's Fees*

54) Texas Children's Hospital sought sanctions in the amount of $776,607.00, representing the amount of attorney's fees it expended in retaining the law firm of Vinson & Elkins, LLP to defend it against Nath's frivolous claims, excluding legal work related to Nath's recusal motions and the Motion for Sanctions. Considering the extensive discovery undertaken, the numerous discovery disputes presented to the Court, the extended rounds of summary judgment briefing, the duration of time in which this case has been pending, and the amount in controversy,[65] the Court finds that attorney's fees in the amount of $726,000.00 are reasonable.[66]

*The Relative Sensibilities of the Parties*

55) The Court finds, as a matter of fact, that a large sanction is required to sufficiently punish Nath's conduct and deter similar conduct in the future.

56) Nath's office manager testified that Nath took in more than $6 million in 2006.[67] This figure was corroborated by a letter from Nath's account that indicates that from 2004 to 2007, Nath "[g]enerated taxable income in the low to mid seven figure range" and had sufficient liquid assets in 2007 to acquire an $8 million residence.[68]

57) The Court further finds that Texas Children's Hospital, a non-profit organization. has incurred a substantial amount of legal fees defending against Nath's claims in this lawsuit. The fees incurred by Texas Children's Hospital total more than $776,607.00.

---

[65] *See* Expert Witness Report of Rodney W. Sowards at 5 (attached as Exhibit 21 to Plaintiff's Response to Baylor College of Medicine's Motion for Summary Judgment and No-Evidence Motion for Summary Judgment, filed Mar. 30, 2010).
[66] The fees incurred and paid by Texas Children's Hospital are proven by the affidavit of Patrick W. Mizell, attached as Exhibit F to TCH's Motion for Sanctions, of which the Court took judicial notice without objection.
[67] TCH Traditional MSJ, Ex. 5 at 25:4–26:24.
[68] *Id.,* Ex. Y at NATH 000126.

19

: 06473

## CONCLUSIONS OF LAW

58)     While Nath has a right to petition the courts for redress of legitimate grievances, he does not have a right to bring baseless litigation in bad faith or for improper purposes. As set forth herein, Nath's actions in this lawsuit merit that he be required to pay Texas Children's Hospital's attorney's fees as a sanction for his conduct.

*Applicable Legal Standards*

59)     The court has broad discretion to award sanctions. *Delgado v. Methodist Hosp.*, 936 S.W.2d 479, 487 (Tex. App.—Houston [14th Dist.] 1996, no writ) (stating that a trial court's award of sanctions is reviewed for abuse of discretion). "The degree of discretion afforded the trial court is . . . greater when sanctions are imposed for groundless pleadings than when imposed for discovery abuse." *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 827 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). The law grants courts the power to sanction litigants in order to secure compliance with the rules, punish rule-breakers, and deter future litigants from violating the rules. *Delgado*, 936 S.W.2d at 488. The court's power to levy sanctions is derived from Chapter 10 of the Civil Practice and Remedies Code and from Rule 13 of the Rules of Civil Procedure. While these authorities overlap considerably, each has its own test the court must apply before issuing sanctions.

60)     Under Chapter 10, a court may impose monetary sanctions upon a showing that a party has filed a pleading for an improper purpose *or* asserted a claim without evidentiary support. TEX. CIV. PRAC. & REM. CODE §§ 10.001(1), (3); 10.004(a).[69] To comply with Chapter 10, the party and the attorney filing the pleading must undertake a "reasonable inquiry" to

---

[69] The Court recognizes that a party cannot be monetarily sanctioned for a violation of Section 10.001(2), which requires a reasonable inquiry that each claim or legal contention be warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. *See* CPRC § 10.004(d). Although the pleadings do violate Section 10.001(2), the Court's assessment of sanctions is based on violations of Sections 10.001(1) and (3) and TRCP 13, as set forth herein.

20

: 06474

ensure the pleading does not violate the Chapter 10 prohibitions. *Id.* at § 10.001. For instance, the filing party and attorney must make a reasonable inquiry to ensure a pleading is not filed for an improper purpose, such as to harass, delay, or increase the cost of the litigation. *Id.* at § 10.001(1). In addition, the filing party and attorney must undertake a reasonable inquiry to make certain the claims set forth in the filing have evidentiary support. *Id.* The assertion of a claim that lacks any evidentiary support is sanctionable under Chapter 10. TEX. CIV. PRAC. & REM. CODE § 10.001(3); *see also Sellers v. Gomez*, 281 S.W.3d 108, 115 (Tex. App.—El Paso 2008, no pet.) (upholding Chapter 10 sanctions where plaintiff filed claim with knowledge there was no evidence of a necessary element).

61)    A party seeking sanctions under Rule 13 must show that the pleading is groundless and filed in bad faith or for purposes of harassment. TEX. R. CIV. P. 13. Like Chapter 10, Rule 13 requires that the filing party perform a "reasonable inquiry" to ensure a pleading is not groundless or filed in bad faith. *Id.* A groundless pleading has "no basis in law or fact and [is] not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* Groundlessness, therefore, "turns on the legal merits of a claim." *Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex. App.—Austin 2008, pet. denied). In determining if a claim is groundless, the trial court examines the facts and circumstances at the time of filing. *Id.* A claim without evidentiary support is groundless for purposes of Rule 13, as it has no basis in fact or law. *See Delgado*, 936 S.W.2d at 487–88 (finding IIED claim groundless and filed in bad faith where plaintiff presented no evidence of "extreme and outrageous" conduct).

62)    Before imposing Rule 13 sanctions on the basis of groundlessness, the trial court must also determine that the groundless claim was filed in bad faith or for the purpose of harassment.

21

: 06475

TEX. R. CIV. P. 13. "A party acts in bad faith when discovery puts him on notice that his understanding of the facts may be incorrect, and he does not make reasonable inquiry into the facts before filing a pleading." *Robson*, 267 S.W.3d at 407. A court may accordingly find bad faith where a party asserts a claim with knowledge that the evidence fails to support the claim. *Id.*; *see also Attorney Gen. v. Cartwright*, 874 S.W.2d 210, 215–16 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (affirming trial court's findings of groundlessness and bad faith where the Attorney General repeatedly failed to produce evidence essential to its cause of action).

63) "Generally, a sanction cannot be excessive nor should it be assessed without appropriate guidelines." *Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007). The Texas Supreme Court has indicted that the following "nonexclusive list" of factors, compiled by the American Bar Association, are "relevant" and "useful to this type of analysis":

a.  the good faith or bad faith of the offender;

b.  the degree of willfulness, vindictiveness, negligence. or frivolousness involved in the offense;

c.  the knowledge, experience. and expertise of the offender;

d.  any prior history of sanctionable conduct on the part of the offender;

e.  the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f.  the nature and extend of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g.  the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h.  the risk of chilling the specific type of litigation involved;

i.  the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

22

: 06476

39

j.      the impact of the sanction on the offended party, including the offended person's need for compensation;

k.      the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l.      the burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

....

n.      The degree to which the offended person's own behavior caused the expenses for which recovery is sought....

*Id.* at 620 & n.5. A court need not "address all of the[se] factors," but "should consider relevant factors in assessing the amount of the sanction." *Id.* at 620. In addition, the determination of the amount of a penalty assessed under Chapter 10 should "begin with an acknowledgement of the costs and fees incurred because of the sanctionable conduct." Attorney's fees "provide[] a monetary guidepost of the impact of the conduct on the party seeking sanctions and the burdens on the court system." *Id.*

64)     This sanctions award is based on the totality of Nath's conduct throughout this litigation, as set forth herein. The law is clear that sanctions may be assessed based on cumulative conduct throughout a litigation. *See, e.g., In re M.I.L.,* No. 2-08-349-CV, 2009 WL 1740066, at *3 (Tex. App.—Fort Worth June 18, 2009, no pet.) (affirming sanctions assessed under CPRC § 10, based on the sanctioned party's "testimony, on the frivolous pleadings on which the trial court had granted summary judgment, and on [the sanctioned party's] pattern of conduct"); *Falk & Mayfield L.L.P. v. Molzan,* 974 S.W.2d 821, 826 (Tex. App.-Houston [14 Dist.] 1998, pet. denied) (holding that the trial judge was "entitled to consider the entire history of the case before him" in assessing sanctions for filing of groundless defamation claims).

23

: 06477

65)     The Court, in granting Texas Children's Hospital's Traditional Motions for Summary Judgment on all of Plaintiff's claims, has affirmatively concluded that Nath's claims were without substantive merit. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979) ("The trial court may not grant a [traditional] summary judgment by default for lack of an answer or response to the motion by the non-movant when the movant's summary judgment proof is legally insufficient. The movant still must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law."). In accordance with *Clear Creek*, the Court concluded, based on ample summary judgment proof, that Texas Children's Hospital's Traditional motions for summary judgment were meritorious and should be granted.[70] Some of the reasons for that determination are set forth below.

*Nath's IIED Claims Were Groundless and Lacked Evidentiary Support*

66)     Nath's IIED claim was, on its face, completely lacking in factual support and therefore barred by established Texas law. *See Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 815 (Tex. 2005); *Hoffman-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004).

---

[70] *See* Order Granting Defendant Texas Children's Hospital's Motions for Summary Judgment, filed June 18, 2010 ("Having considered Texas Children's Hospital's Motion for Summary Judgment...and Supplemental Traditional...Motion for Summary Judgment...all pertinent parts of the record, and argument of counsel, if any, the Court has determined that the Motions are meritorious and should be GRANTED.").

Unlike a traditional motion for summary judgment, a no-evidence motion for summary judgment must be granted by default when the nonmovant fails to respond. *See, e.g., Landers v. State Farm Lloyds*, 257 S.W.3d 740, 746 (Tex. App.—Houston [1ˢᵗ Dist.] 2008) ("Absent a timely response, a trial court must grant a no-evidence motion for summary judgment that meets the requirements of Rule 166a(i)....[A]s Texas courts have repeatedly held, the traditional prohibition against summary judgment by default is inapplicable to motions filed under Rule 166a(i)."). The Court also granted Texas Children's Hospital's no-evidence motions for summary judgment. *See* Order Granting Defendant Texas Children's Hospital's Motions for Summary Judgment, filed June 18, 2010 ("Having considered Texas Children's Hospital's...No-Evidence Motion for Summary Judgment...and Supplemental...No-Evidence Motion for Summary Judgment...the Court has determined that the Motions are meritorious and should be GRANTED.").

24

: 06478

41

There is nothing "extreme" or "outrageous" about the types of conduct Nath alleged, which included claims that:

a.   Dr. Rita Lee, a Baylor physician, posted on an internet message board that Nath had disappeared from the Clinic without notice;[71]

b.   Dr. Ralph Feigin, a Baylor physician acting as editor for a pediatrics journal, decided against publishing an article that Nath had co-authored;[72]

c.   Nath's patients were referred to Dr. Saleh Shenaq, Nath's partner;[73]

d.   Lisa Thompson, a Baylor employee, told a parent of a minor patient that Nath was "a terrible doctor;"[74]

e.   Dr. Shenaq, Nath's co-worker and supervisor at Baylor, referred to Nath as a "cancer that needed to be cut out."[75]

67)   Given the amount of discovery that had been conducted in the case prior to his assertion of the IIED claim, it is evident that Nath asserted the claim with full knowledge that he could not possibly satisfy his evidentiary burden. Additionally, Nath admitted under oath, prior to filing the Sixth Amended Petition, that he did not suffer the type of severe emotional distress required to prove an IIED claim. In his deposition, Nath testified that he was merely "worried" (principally about the lawsuit that *he* instigated).[76] He also testified that the Defendants' alleged conduct affected him in "subtle" ways, and that he had not sought out the help of any medical professional.[77]

---

[71] July 7, 2009 Deposition of Rahul K. Nath, M.D., Volume 2 ("Nath Depo. Vol. 2") at 78:15–79:22 (attached as Exhibit A to Baylor College of Medicine's Traditional and No Evidence Motion for Summary Judgment, filed January 4, 2010).

[72] Sixth Amended Petition at 4.

[73] Sixth Amended Petition at 12; Nath Depo. Vol. 2 at 117:16-21.

[74] Nath Depo. Vol. 2 at 124:25–125:19.

[75] Sixth Amended Petition at 11.

[76] Nath Depo. Vol. 2 at 166:22–168:3

[77] *Id.* at 166:22–168:18. *See also* TCH's Supplemental Traditional and No-Evidence Motion for Summary Judgment on Plaintiff's Claim for Intentional Infliction of Emotional Distress, filed May 24, 2010, at 10–13 (setting out Nath's lack of severe emotional distress).

25

: 06479

68) Nath's failure to allege any "extreme and outrageous" conduct or severe emotional distress were not only fatal to the IIED claim; these failures also demonstrate that the claim was groundless. *See Delgado*, 936 S.W.2d at 486–88 (finding plaintiff's IIED claim groundless due to the plaintiff's failure to allege "extreme and outrageous" conduct).

69) Finally, Texas law absolutely prohibits a plaintiff from asserting a claim for IIED when the gravamen of the action sounds in another tort. *See Zeltwanger*, 144 S.W.3d at 447 (describing IIED as a "gap-filler" tort); *Creditwatch*, 157 S.W.3d at 818 ("[IIED] was never intended as an easier and broader way to pursue claims already protected by [Texas's] expanding civil and criminal laws."). This is a well-settled principle of Texas case law. *See, e.g.*, MICHOL O'CONNOR, O'CONNOR'S TEXAS CAUSES OF ACTION (2009) at 371. Nath simply repackaged his previous pleading for defamation, and re-labeled it as a new cause of action. Texas law prohibits this, and the barest of legal inquiries would have revealed as much. *See, e.g.*, O'CONNOR'S at 371 (citing three Supreme Court opinions). Because Nath's IIED claim runs directly contrary to established Texas law, it is groundless by definition. *See Stiles v. Gillum*, 872 S.W.2d 786, 794 (Tex. App.—Fort Worth 1994, writ denied) (finding plaintiff's claim groundless where the cause of action had previously been abolished); *see also Thottumkal v. McDougal*, 251 S.W.3d 715, 718 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (finding claim groundless where reasonable inquiry would have revealed claim was barred by law).

*Nath Alleged Numerous Groundless Defamation Claims*

26

06480

43

70) If Nath had performed any inquiry at all into his defamation claims prior to asserting them, he would have discovered that these claims were groundless too, as they were time-barred and nondefamatory in nature.

71) Texas imposes a one-year limitations period for defamation claims. TEX. CIV. PRAC. & REM. CODE § 16.002(a). Nath's defamation claims clearly fall outside of the one-year period. This was a fact well-known to Nath, as he had engaged an attorney to undertake a letter writing campaign in response to the allegedly defamatory statements almost two years before filing suit. The following are some examples of Nath's patently time-barred claims:

a. On June 2, 2004, Nath received a letter from Drs. Grossman and Brunicardi of Baylor terminating his employment contract. Nath complained about the termination letter through his attorney on June 7, 2004, well over one year before filing suit.[78]

b. Nath claimed that Dr. Rita Lee of Baylor defamed him in a post she allegedly made in June 2004 on an internet message board for the United Brachial Plexus Network.[79] Nath's attorney complained to Baylor about Dr. Lee's posting on June 15, 2004.[80]

c. Nath alleged that Dr. Shenaq made oral misstatements that Nath was fired for inappropriate conduct.[81] Nath also claimed that Dr. Shenaq republished the Nath termination letter in the Texas Children's Hospital operating room.[82] Nath, through his attorney, complained about these alleged statements at least twice by letters dated June 8, 2004, and June 15, 2004.[83] Yet Nath did not bring suit until more than a year later.

d. Nath claims that Lisa Thompson, a Baylor employee, told the parent of a patient that Nath was fired from Baylor for misconduct.[84] He also alleged that Ms. Thompson told the parent that she had not seen Nath in weeks, that he was a "terrible doctor," and that he was being investigated by Texas Children's

---

[78] TCH Traditional MSJ, Exhibit B.
[79] Nath Depo. Vol. 2. at 78:15–79:22.
[80] TCH Traditional MSJ, Exhibit D.
[81] Nath Depo. Vol. 2. at 78:15–79:22; 81:14–21.
[82] Id. at 86:1–12.
[83] TCH Traditional MSJ, Exhibits J, D.
[84] Nath Depo. Vol. 2 at 97:15–98:24.

27

: 06481

Hospital.[85] Nath admitted he learned of these statements in June or July of 2004; they are time- barred.[86]

e.  While Nath did not allege exactly when Lisa Davis made alleged statements about him to the parent of a patient, he admitted that the parent contacted him by telephone in June or July of 2004 and told him about the statements.[87] The parent also purportedly sent Nath an email concerning the statements on June 30, 2004, relaying the alleged conversation with Ms. Davis.[88]

72)  Nath did not file this lawsuit until February 17, 2006. Most of these allegedly defamatory statements occurred in June or July of 2004, and all of the alleged defamatory statements would have occurred prior to the end of 2004, when Texas Children's Hospital closed the Brachial Plexus Clinic. Nath was concerned enough to hire legal counsel to respond in writing to at least three of the five above-described defamation claims. He had to have been cognizant of the fact that he needed to respond in a timely manner. Yet he waited until the statute of limitations period had expired before bringing these claims. Where a reasonable inquiry would have revealed that a claim was barred by the applicable statute of limitations, the claim is groundless.[89] *See McDougal*, 251 S.W.3d at 718 (noting that a time-barred claim is a groundless claim where a reasonable inquiry would have revealed the claim was time-barred); *Dolenz v. Boundy*, 197 S.W.3d 416, 422 (Tex. App.—Dallas 2006, pet. denied) (affirming sanctions where plaintiff "was aware of the applicable statute of limitations").

73)  Additionally, many of Nath's defamation allegations consisted of statements that were, on their face, nondefamatory. For example:

---

[85] *Id.* at 125:1–8.

[86] *Id.* at 125:9–11; 184:10–14.

[87] *Id.* at 184:10–14.

[88] TCH Traditional MSJ, Exhibit N.

[89] Nath's claims of negligence and tortious interference are also groundless to the extent that those claims rely on time-barred, allegedly defamatory statements.

28

: 06482

a.  Dr. Rita Lee posted on an internet message board that Nath had disappeared from the Clinic without notice;[90]

b.  Drs. Shenaq and Michael Klebuc allegedly told the parent of a patient that Nath had "gone into research";[91]

c.  Lisa Thompson, a Baylor employee, allegedly told a parent of a patient that Nath had "disappeared";[92]

d.  Dr. Shenaq allegedly told a parent of a patient that Nath had disappeared and left no forwarding address.[93]

74)  There is simply nothing defamatory about these types of statements. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 921 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (noting that to qualify as defamatory, a statement must be an egregious affront to a party's honesty, integrity, reputation, or virtue). Because people are generally free to speak their opinions, "[a] statement may be false, abusive, unpleasant, and objectionable ... without being defamatory." *Molzan*, 974 S.W.2d at 824 n.2 (quoting *Schauer v. Mem'l Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.—Houston [1st Dist.] 1993, no writ)). The absurdity of claiming that the alleged statements constitute defamation supports the conclusion that these claims were groundless, brought in bad faith, and therefore subject to sanctions under Rule 13 and Chapter 10. *Molzan*, 974 S.W.2d at 824 (upholding findings of groundlessness and bad faith where defamation claim was "blatantly vacuous"); *Delgado*, 936 S.W.2d at 487–88 (affirming Rule 13 sanctions where plaintiff claimed that hospital's staff's denial of a private room supported a claim for IIED).

---

[90] Nath Depo. Vol. 2 at 78:15–79:22.
[91] *Id.* at 100:17–101:20.
[92] *Id.* at 123:19–124:3.
[93] *Id.* at 119:16–20; 122:2–8. *See also* Claims 1, 2, 8–10, 12–17, and 20 as set forth in TCH Traditional MSJ at 36–40, 47–54.

29

: 06483

*Nath's Declaratory Judgment Action Was Wholly Groundless*

75)     By filing his declaratory judgment action, Nath purportedly sought some sort of declaration of his "rights, interests, and duties" with respect to both his own patients, as well as to former patients of the deceased Dr. Shenaq, who Nath claimed may have been affected by Dr. Shenaq's alleged impaired vision and hepatitis.[94] Nath sought to have the Court order declaratory relief, as he put it, so that Dr. Shenaq's patients could "potentially obtain legal counsel to advise them of their rights."[95]

76)     The Texas Civil Practice and Remedies Code, codifying the Uniform Declaratory Judgment Act ("UDJA"), defines when a party may put forth an action for declaratory judgment:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004. As the Court has previously concluded, the UDJA simply does not apply to Nath's allegations.

77)     Nath purported to ground his right to declaratory judgment on section 160.003 of the Texas Occupations Code, which directs a person subject to the Code to "report relevant information to the [Texas Medical] board relating to the acts of a physician in this state if, in the opinion of the person . . . that physician poses a continuing threat to the public welfare through the practice of medicine." TEX. OCC. CODE § 160.003. Citing this statute, Nath apparently sought an order from the Court directing him to adhere to the Texas Occupations Code with respect to his allegations concerning the health of Dr.

---

[94] Fifth Amended Petition at 22–23.
[95] Nath MSJ Response at 68.

30

: 06484

Shenaq. However, merely citing to a statute does not satisfy the requirements of the UDJA. To bring a declaratory judgment action, the statute in question must involve a "question of construction or validity" affecting the party's "rights, status, or other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.004.

78)   The intersection of Texas Occupations Code section 160.003 and the alleged health problems of Dr. Shenaq does not raise any questions regarding the "construction or validity" of the statute, and does not affect any "right, status, or legal relation" belonging to Nath. In fact, the very statute that Nath cites plainly sets out his responsibility—as a physician—with respect to this situation. This Court pointed out as much at the hearing on Nath's first motion for continuance.[96]

79)   Nath pointed to no "question of construction or validity" that concerned his "rights, status, or other legal relation[]" affected by the Texas Occupations Code. In fact, his citation to the Texas Occupations Code was little more than a last-ditch effort to avoid summary judgment.[97] Because he clearly lacked a factual basis to bring the claim in the first instance, his declaratory judgment claim was groundless. *See Mosk*, 183 S.W.3d at 696 (upholding trial court's determination that DTPA claim was groundless and frivolous where plaintiff lacked standing to bring a DTPA claim); *see also Delgado*, 936 S.W.2d at 487–88 (affirming sanction imposed where IIED claim failed as a matter of law because the plaintiff did not allege or provide evidence of "extreme and outrageous" conduct).

*Nath Prosecuted this Lawsuit in Bad Faith and For an Improper Purpose*

80)   The Court concludes that, as set forth above, Nath brought this groundless case in bad faith, to obtain a financial windfall based on alleged wrongdoings of Dr. Shenaq that have

---

[96] Transcript of Jan. 21, 2010 Hearing, at 51:20–52:24.

[97] Nath only cited to this section in his response to the initial motions for summary judgment. *Compare* Fifth Amended Petition at 22–23 *with* Nath MSJ Response at 68–70.

31

: 06485

nothing to do with Nath, and to harass Texas Children's Hospital. The Court also concludes that Nath's repeated efforts to delay proceedings in this case, as set forth above, evidence bad faith and an improper purpose. Nath's bad faith and improper purposes provide an independent ground for sanctions under Chapter 10. TEX. CIV. PRAC. & REM. CODE § 10.001(a) (providing for sanctions where a pleading is filed for an improper purpose). Furthermore, the Court concludes that his bad faith satisfies the second prong of the test for levying sanctions under Rule 13. TEX. R. CIV. P. 13; *Robson*, 267 S.W.3d at 407.

81)     As described above, Nath's baseless declaratory judgment claim evidences his bad faith in prosecuting this lawsuit. As the Court has observed firsthand, Nath prosecuted the declaratory judgment claim in a fruitless effort to open a discovery front into the alleged health issues of Dr. Shenaq and to discover the identities of Dr. Shenaq's patients.[98] Nath openly admitted in his Fifth Amended Petition that he hoped to use this lawsuit to discover Dr. Shenaq's patients so that he could help them "obtain legal counsel to advise them of their rights."[99] Nath himself carried out this strategy in the affidavit he filed with the Court.[100] As this Court has previously found, Nath was plainly trying to use Dr. Shenaq's health and patient information and the threat of patient lawsuits as "as a tool in [his] litigation" to gain a financial advantage in settlement negotiations.[101] Accordingly, this Court—on more the one occasion—explicitly advised Nath's counsel that the health of Dr.

---

[98] *See, e.g.,* Transcript of Jan. 21, 2010 Hearing, at 42–45.

[99] Fifth Amended Petition, at 24.

[100] Affidavit of Rahul K. Nath, M.D (attached as Exhibit 1 to Plaintiff's Response to TCH's Motion for Summary Judgment, filed Mar. 25, 2010).

[101] *See* Transcript of July 24, 2009 Hearing at 21:12-21:18 (attached as Exhibit D to TCH's Motion for Sanctions); *see also* Letter from Bruce M. Flowers to Patrick W. Mizell dated June 26, 2009, at 7 (attached as Exhibit A to Texas Children's Hospital's Response to Plaintiff's Supplemental Motion to Compel Dated July 20, 2009, filed July 23, 2009).

32

: 06486

Shenaq was not relevant and not at issue in this lawsuit.[102] In spite of this Court's admonitions, Nath, through his counsel, continued to pursue Dr. Shenaq's alleged health issues. Nath's act of doggedly pursuing his groundless declaratory judgment claim under false pretenses, for his own financial gain, is further evidence that his motives in this suit warrant sanctions. *See* TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE § 10.001; *cf. Wallace v. Inv. Advisors, Inc.*, 960 S.W.2d 885, 889 (Tex. App.—Texarkana 1997, pet. denied) (affirming sanctions where the plaintiff "used an improper method to attempt to obtain evidence for a matter not involved in the present litigation").[103]

82)    The Court also concludes that Nath's assertion of claims which he knew to be time-barred itself evidences bad faith and improper purpose. *Dolenz*, 197 S.W.3d at 422; *see also Campos*, 879 S.W.2d at 74 (refusing to find a time-barred claim was filed in good faith where the fact "[t]hat the applicable statute of limitations had run was well established").

83)    When his declaratory judgment tactic failed, Nath's counsel immediately filed his Sixth Amended Petition, asserting his baseless IIED claim. The Court concludes that, given the

---

[102] Transcript of July 24, 2009 Hearing. at 16:19–17:1, 21:15–18, 48:11–18; Transcript of Jan. 21, 2010 Hearing, at 42:7–8, 42:15–16, 42:25–43:1, 51:21, 52:6–9.

[103] This conduct is also an abuse of process as that term is defined in *Blackstock v. Tatum*, 396 S.W.2d 463, 468 (Tex.App.-Houston [1st Dist.] 1965, no writ) (quoting PROSSER ON TORTS, 3rd ed., § 115):

> The essential elements of abuse of process ... have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

Because Nath's conduct is an abuse of process, sanctions are also appropriate under the Court's inherent authority. *See, e.g., Gilbert & Maxwell, PLLC v. Texas Mut. Ins. Co.*, 2008 WL 5264910 (Tex. App.-Austin Dec. 19, 2008).

33

: 06487

timing and circumstances that surrounded the filing of the Sixth Amended Petition, it is clear that the IIED claim was a continuation of Nath's bad faith course of conduct. As discussed above, Nath only asserted his IIED claim after the parties fully briefed the motions for summary judgment that addressed the claims in the Fifth Amended Petition, and then only after he had successfully delayed the hearing on summary judgment by filing two recusal motions. Further, he did not even substantively respond to the summary judgment motions addressing his IIED claim, suggesting he never intended to prosecute the claim. A claim filed to delay a hearing is not filed in good faith or filed for a proper purpose. TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE § 10.001(1). Such conduct is, standing alone, sanctionable under Chapter 10. TEX. CIV. PRAC. & REM. CODE § 10.001(1) (allowing for sanctions where claim is brought for an improper purpose). It also evidences Nath's bad faith and warrants sanctions under Rule 13.

84)    This Court recognizes that a party should not be punished for counsel's conduct unless the party is implicated apart from having entrusted its legal representation to counsel. *See, e.g., Glass v. Glass*, 826 S.W.2d 683, 687 (Tex. App.—Texarkana 1992, writ denied) (concluding that sanction of party was improper because "[n]owhere in its findings of fact did the trial court find that Peggy Glass did anything other than what her attorney did on her behalf" and "no evidence was adduced which tended to show that Peggy Glass did anything except rely on her attorney's advice"); *Bradt v. Sebek*, 14 S.W.3d 756, 769 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (noting that sanctioning of party was appropriate based on party's affidavit).[104] However, the both Rule 13 and Chapter 10 provide for sanctioning

---

[104] Plaintiff argues, citing to *Transamerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991), that the Court should determine what conduct is attributable to Nath's attorneys. *Transamerican* involved discovery sanctions under different rules of procedure, and is not applicable here. *See, e.g., Parker v. Lancon*, 2002 WL 192371, at *2 n.1 (Tex. App.—Houston [14th Dist.] Feb. 7, 2002) (stating that *Transamerican* did not apply to court's

34

: 06488

parties under appropriate circumstances. CPRC Section 10.004 states that a court that determines that a person has signed a pleading or motion in violation of Section 10.001 "may impose a sanction on the parson, *a party represented by the person*, or both." (emphasis added). Rule 13 likewise states that if a pleading, motion or other paper is signed in violation of the rule, the court "shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it. *a represented party*, or both." (emphasis added). It is clear that sanctions may be appropriate "where the evidence…demonstrates that a party is at fault independent of the culpability of her attorney." *Parker v. Lancon*, 2002 WL 192371, at *2 (Tex. App.—Houston [14th Dist.] Feb. 7, 2002, pet. denied). As set forth above, this Court is sanctioning Nath for improper and bad faith conduct in which the Court has found Nath took an active role.

*Texas Children's Hospital's Request for Sanctions is Not Barred by* Res Judicata *and is Procedurally Proper*

85)  Nath claimed. in opposing the Motion for Sanctions, that Texas Children's Hospital's request for sanctions is barred by *res judicata*. That doctrine "bars the litigation of claims actually litigated as well as those arising from the same transaction that could have been litigated." *Igal v. Brightstar Info. Tech. Group*, 250 S.W.3d 78, 86 (Tex. 2008). *Res judicata* has three elements: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) the same parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Id.* The third element is not met here, for two reasons. First, the Motion for Sanctions proceeded in the same case as the first action, and not in "a second action."

---

review of lower court's award of sanctions under Rule 13 for bad-faith litigation because "*Transamerican* involved discovery abuse," and "it can be particularly difficult to determine whether a party or her attorney is responsible for discovery abuse."). In any event, *Transamerican* affirms that "a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses." *Id.*

35

: 06489

Second, the Motion for Sanctions is not a "claim." *See, e.g., Mantri v. Bergman,* 153 S.W.3d 715, 717-18 (Tex. App.—Dallas 2005, pet. denied) ("The Texas courts have treated proceedings for sanctions as motions, not as independent causes of action.").

86) This is not a case "in which a party [is attempting to] pursue a *claim* determined by the final judgment of a court of competent jurisdiction in a *prior suit* as a ground of recovery in a *later suit* against the same parties." *Igal,* 250 S.W.3d at 86 (emphasis added). It is a simply a case in which a party has moved to modify the judgment to assess fees as sanctions in the same lawsuit. This is routine practice, and was expressly approved by the Texas Supreme Court in *Lane Bank Equip. Co. v. Smith S. Equip., Inc.,* 10 S.W.3d 308 (Tex. 2000). In that case. Lane Bank Equipment sued Smith Southern for unfair competition, tortious interference, and misappropriation of trade secrets. 10 S.W.3d at 310. The trial court granted Smith Southern's motion for summary judgment. *Id.* Three weeks later, Smith Southern moved for sanctions and for a new final judgment. *Id.* The trial court granted the motion for sanctions and signed a new judgment awarding Smith Southern attorney's fees and expenses. *Id.* The Supreme Court upheld the trial court's ruling, finding that the motion for sanctions and for new judgment constituted a proper motion to modify, correct or reform the judgment under Rule 329b(g). *Id.* at 312.

87) Additional authority for Texas Children's Hospital's motion to modify the judgment so as to assess sanctions—and for the Court's authority to modify the judgment to award such sanctions—is found in *Alpert v. Crain, Caton & James, P.C.,* 178 S.W.3d 398 (Tex. App.-- Houston [1st Dist] 2005, pet. denied). In *Crain,* the court dismissed the plaintiff's case on special exceptions in January 2004. 178 S.W.3d at 402. In February 2004, the defendant moved for sanctions under Chapter 10 and Rule 13. *Id.* at 408. The court

36

: 06490

53

granted the sanctions in April 2004. *Id.* On appeal, the plaintiff challenged the award of sanctions, arguing that the trial court had been without plenary power to assess sanctions. *Id.* at 409. Citing to *Lane Bank*, the court of appeals rejected the plaintiff's argument, finding that the defendant's motion for sanctions qualified as an appropriate motion to change an existing judgment and therefore had extended the time period of the court's plenary power. *Id.* at 410.

88) Post-judgment sanctions are appropriate here because the sanctions are predicated on the granting of the motions for summary judgment. Plaintiff claims, citing to *Remington Arms Co. v. Caldwell*, 850 S.W.2d 167 (Tex. 1993), and *Finlay v. Olive*, 77 S.W.3d 520 (Tex. App.—Houston [1st Cir.] 2002, no pet.), that the sanctions were required to be assessed before the final judgment. *Remington* and *Finlay* are inapplicable here, as they involved discovery sanctions, rather than groundless and bad faith filings. *See Remington*, 850 S.W.2d at 170 (holding that "failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct"); *Finlay*, 77 S.W.3d at 526 (noting that the postponement of "rulings on completed pre-trial [discovery] matters, where trial pleadings in the case are not at issue, and where trial testimony has no bearing on the sanctions dispute, would be to violate the very essence of *Remington Arms*"). Here, the Court had not made any conclusion that the claims in this lawsuit were groundless until it granted the motions for summary judgment. At that point, the Motion for Sanctions based on those rulings was proper. There can be no question that sanctions for bad faith and groundless filings may be awarded after the entry of a final judgment. *See Lane Bank*, 10 S.W.3d at 310-12; *Alpert*, 178 S.W.3d at 402-10.

37

: 06491

54

89) Texas Children's Hospital was within its rights in nonsuiting its claims for statutory attorney's fees based on the Uniform Declaratory Judgments Act, Section 37.009 of the Civil Practice and Remedies Code; and the Texas Medical Practice Act, Section 160.008(c) of the Texas Occupations Code. The legal standards and procedures for awarding attorney's fees under the Uniform Declaratory Judgments Act and the Medical Practice Act, and for awarding sanctions under Chapter 10 and Rule 13 in the form of legal fees, are entirely different. A court has discretion to award "reasonable and necessary attorney's fees as are equitable and just" to claimants and counterclaimants under the Uniform Declaratory Judgments Act. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009; *see also, e.g., Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 891 (Tex. App.-Austin 2010, pet. denied). An award of attorney's fees under the UDJA is not predicated upon groundlessness or bad faith. *Id.* The Medical Practice Act provides that a health care entity that is a defendant in a civil action resulting from a peer review proceeding may file a counterclaim to recover attorney's fees "if the plaintiff's original action is determined to be frivolous *or* brought in bad faith." TEX. OCC. CODE ANN. § 160.008(c) (emphasis added); *see also Dallas County Medical Soc'y v. Ubinas Brache*, 68 S.W.3d 31, 44 (Tex. App.-Dallas 2001, pet. denied). In contrast, motions for sanctions under Chapter 10 and Rule 13 are not treated as claims, and the standards for culpability are different, requiring groundlessness and bad faith or harassment. *See, e.g., Mantri*, 153 S.W.3d at 717-18; TEX. CIV. PRAC. & REM. CODE ANN. § 10.001, 10.004; TEX. R. CIV. P. 13. Thus Texas Children's Hospital assumed a different, and in many respects higher, burden of proof in seeking attorney's fees as

38

: 06492

sanctions and did not attempt to "rehash...the entire lawsuit with...explicitly non-suited claims," as Plaintiff claims.

*The Court, In its Discretion, Awards Sanctions of $726,000.00*

90)   As with the initial decision to impose sanctions, the trial court has broad discretion in determining the appropriate amount of sanctions. "The trial court's discretion is limited only by the requirement that its order be just and that the sanction imposed be specifically related to the harm done by the sanctioned conduct." *Attorney General*, 874 S.W.2d at 216. Both Rule 13 and Chapter 10 provide that a trial court may sanction the offending party in the amount of the expenses—including attorney's fees—incurred by the offended party. TEX. CIV. PRAC. & REM. CODE § 10.004(C)(3); TEX. R. CIV. P. 13, 215.2(b). Proof of the reasonableness and necessity of attorney's fees is not required when fees are assessed as sanctions. *Olibas v. Gomez*, 242 S.W.3d 527, 535 (Tex. App.—El Paso Aug. 23, 2007, pet. denied) (citing *JHC Ventures, L.P. v. Fast Trucking, Inc.*, 94 S.W.3d 762, 778 (Tex. App.—San Antonio 2002, no pet.) and *Gorman v. Gorman*, 966 S.W.2d 858, 868-69 (Tex.App.—Houston [1st Dist.] 1998, pet. denied)).

91)   In determining the amount of sanctions, this Court has considered the factors listed in *Low v. Henry*, 221 S.W.3d at 620 & n.5. In light of Nath's bad faith and improper purposes, as set forth herein; Nath's knowledge of the law as a former legal student; Nath's prior conduct as a litigant in numerous cases; the expenses incurred by Texas Children's Hospital as a result of the litigation and their reasonable proportion to the amount Nath sought in damages; the relative culpability of Nath, as set forth above; the minimal risk of chilling legitimate litigation activity posed by sanctions here; Nath's ability to pay for the damages he has caused Texas Children's Hospital; the need for compensation to Texas

39

: 06493

56

Children's Hospital as a result of the damages inflicted upon it in defending against this lawsuit; the necessity of imposing a substantial sanction to curtail Nath's abuse of the judicial process and punish his bad faith and improper conduct; the burdens on the court system attributable to Nath's misconduct, including his consumption of extensive judicial time and resources in prosecuting this case; and the degree to which Nath's own behavior caused the expenses for which Texas Children's Hospital seeks reimbursement, the Court concludes that Texas Children's Hospital should be awarded a substantial portion of its attorney's fees to sanction Nath for his conduct.

92)     As set forth above, Texas Children's Hospital claims that it has incurred over $1 million in attorney's fees in this case, and seeks sanctions in the amount of $776,607.00, which represents the attorney's fees it incurred in this case, excluding fees spent responding to Nath's motions to recuse and in prosecuting the Motion for Sanctions. Nath attacks Texas Children's Hospital's fees affidavit as "attorney-fees hearsay." Parties routinely submit affidavits to prove up fees and expenses. *See, e.g., Petroleum Analyzer Co. LP v. Olstowski*, No. 01-09-00076-CV, 2010 WL 2789016, at *23 (Tex. App.--Houston [1st Dist.] July 15, 2010, no pet.) (upholding award of attorney's fees based on affidavit provided by attorney); *Ramchandani v. Jimenez*, 314 S.W.3d 148, 154 (Tex. App.--Houston [14th Dist.] 2010, no pet.) (same); *see also Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 817 (Tex. App.--Houston [1st Dist.] 2008, no pet.) ("When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required.") (quoting *Miller v. Armogida*, 877 S.W.2d 361, 365 (Tex. App.--Houston [1st Dist.] 1994, writ denied)).[105]

---

[105] The Court concludes that, in providing the fees affidavit, Texas Children's Hospital did not imply that the Court's award of sanctions is limited to the amount of expenses and attorney's fees incurred. Rather, the amount of

40

: 06494

57

93)     Nath argues that the Court's judicial notice of its own file in connection with the award of attorney's fees as sanctions is improper. The case Nath relies on involved an award of attorney's fees under a statutory provision that required that the fees be reasonable and necessary. *See London v. London,* 94 S.W.3d 139, 147-48 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (concluding that court was not authorized to take judicial notice of usual and customary fees and the contents of its file under C.P.R.C. Chapter 38 because that chapter did not apply to claims for child support). *London* is inapplicable because it did not involve fees assessed as sanctions and because, as discussed above, fees may be awarded as sanctions under Chapter 10 and Rule 13 without regard to their reasonableness. In any event, there was no objection to the Court's taking judicial notice of the contents of its file.

94)     Accordingly, the Court concludes that sanctions against Nath in the amount of $726,000.00, which represents a portion of the attorney's fees incurred by Texas Children's Hospital in defending against Nath's groundless claims, are appropriate.

---

sanctions imposed is left to the discretion of the trial court. *See, e.g., Falk & Mayfield, L.L.P. v. Molzan,* 974 S.W.2d 821, 823-24 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) (noting that trial court may impose sanctions above and beyond amount of attorney's fees and expenses).

41

: 06495

SIGNED AND ENTERED this 8th day of November , 2010

JUDGE PRESIDING

42

: 06496

Filed 11 January 10 P4:14
Chris Daniel - District Clerk
Harris County
ED101J016126911
By: Wanda Chambers

CAUSE NO. 2006-10826-A

| | | |
|---|---|---|
| RAHUL K. NATH, M.D. | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| BAYLOR COLLEGE OF MEDICINE | § | |
| | § | |
| *Defendant.* | § | 215TH JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law in connection with its November 19, 2010 Order and Modified Final Judgment granting Baylor College of Medicine's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath. These findings of fact and conclusions of law relate only to this Court's resolution of Baylor College of Medicine's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath; they do not address either Baylor College of Medicine's Traditional and No Evidence Motion for Summary Judgment, filed January 4, 2010, which related to the claims contained in Plaintiff Rahul K. Nath's Fifth Amended Petition, or Baylor College of Medicine's Supplemental Traditional and No Evidence Motion for Summary Judgment, filed May 24, 2010, which related to claims contained in Plaintiff Rahul K. Nath's Sixth Amended Petition.[1] With respect to Baylor College of Medicine's summary judgment motions, there are no facts to find, and the legal conclusions have already been stated in the related motions and responsive pleadings. *See e.g. Willms v. Americas Tire Co.*, 190 S.W.3d 796, 810 (Tex. App.—Dallas 2006, pet. denied).

---

[1] On September 10, 2010, this Court severed Baylor College of Medicine and Rahul K. Nath into this action, Cause No. 2006-10826-A. On November 8, 2010, this Court signed its Findings of Fact and Conclusions of Law in the original action, Cause No. 2006-10826.

65518170.6

: 00458

60

# FINDINGS OF FACT

### Procedural Background

1) On February 17, 2006, Plaintiff Rahul K. Nath ("Nath") filed an Original Petition in Cause No. 2006-10826 (hereinafter referred to as "Main Suit") against: Baylor College of Medicine ("Baylor"), his former employer; Dr. Saleh Shenaq, his former supervisor; and Texas Children's Hospital, which, under an affiliation agreement with Baylor, operated a clinic staffed with Baylor doctors, including Nath and Dr. Shenaq.[2] The lawsuit alleged that Dr. Shenaq and other doctors and clinicians made defamatory statements about Nath that tortiously interfered with his business relations, and the lawsuit sought to hold Baylor and Texas Children's Hospital vicariously liable for the alleged defamatory statements.

2) Two months later, Nath filed in the Main Suit a First Amended Petition naming Johns Hopkins University and Dr. Allan Belzberg as additional defendants, based on alleged defamatory statements Dr. Belzberg made about Nath in Dr. Belzberg's capacity as a Johns Hopkins employee.[3] A battle over this Court's jurisdiction over Dr. Belzberg and Johns Hopkins ensued.[4]

3) Nath filed in the Main Suit a Third Amended Petition nonsuiting Dr. Belzberg and Johns Hopkins in September 2008.[5] The Third Amended Petition also added negligent supervision and training claims against Baylor and Texas Children's Hospital based on the same facts previously alleged.

---

[2] Plaintiff's Original Petition, filed Feb. 17, 2006.
[3] Plaintiff's First Amended Petition, filed Apr. 28, 2006.
[4] *See e.g.* Defendant Allan J. Belzberg's Special Appearance and Objection to Personal Jurisdiction, filed June 9, 2006, and Defendant John Hopkins's University Special Appearance and Objection to Personal Jurisdiction, filed June 9, 2006.
[5] Plaintiff's Third Amended Petition, filed Sept. 2, 2008.

65518170.6

2

: 00459

4) Nath filed in the Main Suit a Fifth Amended Petition on July 23, 2009.[6] In addition to the previously-pleaded claims for defamation, tortious interference, and negligence, the Fifth Amended Petition alleged a new cause of action for a declaratory judgment based on alleged health problems of Dr. Shenaq.

5) There have been numerous discovery battles in this case. A partial listing includes:

    a) On November 18, 2008, Baylor filed in the Main Suit a Motion to Compel Oral Deposition and Written Discovery Responses against Nath. On December 10, 2008, Texas Children's Hospital filed in the Main Suit a Joinder to Baylor's Motion to Compel. This Court, with The Honorable Levi Benton presiding, held a hearing on those motions on December 10, 2008. At the hearing, Judge Benton indicated that Nath would be required to provide certain information regarding his alleged damages and personal finances.[7]

    b) On March 11, 2009, Texas Children's Hospital filed in the Main Suit a Motion to Compel Interrogatory Responses and Production of Documents and Joint Renewed Motion to Compel Oral Deposition Responses against Nath. On April 13, 2009, Baylor filed in the Main Suit a Renewed Motion to Compel Oral Deposition Responses and Extend Time for Nath's Deposition. These motions again sought production of, among other things, certain financial information from Nath. This Court, with the undersigned judge presiding, held a hearing on these motions on April 17, 2009. At the hearing, and in response to the motions, Nath's counsel nonsuited and dismissed all of Nath's claims for damages for injury to his reputation. Nath's counsel also nonsuited and dismissed his claims relating to the falsity of any statement alleging that there exists or has existed a criminal and/or governmental investigation of Nath.[8]

    c) On July 20, 2009, Nath filed in the Main Suit a Supplemental Motion to Compel Against Baylor College of Medicine seeking information from Baylor related to Dr. Shenaq's health, as well as medical records of some of Dr. Shenaq's former patients. On July 21, 2009, Baylor filed in the Main Suit a Response to Plaintiff's Supplemental Motion to Compel. This Court held a hearing on this motion on July 24, 2009.

---

[6] Plaintiff's Fifth Amended Petition, filed July 23, 2009.
[7] Transcript of Dec. 10, 2008 Hearing on Motion[s] to Compel Production, at 10-14, 20-21.
[8] Order on Defendant Texas Children's Hospital's and Baylor College of Medicine's Motion[s] to Compel, dated May 19, 2009.

65518170.6

3

: 00460

6) Baylor filed in the Main Suit its traditional and no-evidence motions for summary judgment on January 4, 2010.[9] Baylor's motion addressed all of Nath's claims in his live Fifth Amended Petition.

7) On January 13, 2010, Nath's counsel filed in the Main Suit numerous motions to compel against Baylor. These motions included: an Emergency Motion to Compel Depositions of Samuel Stal, M.D. and Larry Hollier, Jr., M.D., two Baylor employees; an Emergency Motion to Compel Production of E-Documents Against Baylor; and an Emergency Motion to Compel Discovery Responses Against Baylor College of Medicine. On January 20, 2010, Nath's counsel filed an Emergency Verified Motion for Continuance of Defendants' Summary Judgment Hearings and Plaintiff's Corresponding Summary Judgment Response Deadlines. The Court held a hearing on those motions on January 21, 2010. This Court granted Nath's motion for continuance, ordered depositions of Drs. Stal and Hollier, set March 26, 2010 as the deadline for Nath to file responses to the motions for summary judgment, and set the hearing on the summary judgment motions for April 1, 2010.

8) On March 15, 2010, Nath's counsel filed in the Main Suit a Second Emergency Verified Motion for Continuance of Defendants' Summary Judgment Hearings and Plaintiff's Corresponding Summary Judgment Response Deadlines. On March 19, 2010, the Court held a hearing on the motion and denied the second motion for continuance.

9) On March 26, 2010, Nath filed in the Main Suit his responses to the motions for summary judgment.[10] Baylor and Texas Children's Hospital filed timely replies in anticipation of the April 1, 2010 hearing.[11]

---

[9] Texas Children's Hospital filed its traditional and no-evidence motions for summary judgment on December 30, 2009.

65518170.6

4

: 00481

10) Instead of arguing the merits of his response to the motions for summary judgment at the hearing Nath had a new attorney, Daniel Shea, make an appearance. Nath immediately filed in the Main Suit a motion to recuse the undersigned judge. Per Texas Rule of Civil Procedure 18a(d), the undersigned judge forwarded the motion for recusal to the administrative judge, who in turn assigned the Honorable Mike Engelhart to hear the motion to recuse. Judge Engelhart scheduled a hearing on Nath's recusal motion for Monday, April 5, 2010.

11) Nath's attorneys did not attend the scheduled April 5, 2010 hearing on the recusal motion. Instead, Nath's counsel filed in the Main Suit a Verified Motion to Recuse Hon. Mike Engelhart.

12) Ultimately, the hearing on the original motion to recuse occurred on April 29, 2010. The motion to recuse was denied.[12]

13) In the interim, Nath's counsel filed in the Main Suit a Sixth Amended Petition on April 14, 2010, in which Nath "abandoned" all of his previous defamation, tortious interference, and negligence claims in favor of a claim for intentional infliction of emotional distress ("IED").[13] In response, Baylor and Texas Children's Hospital drafted another round of summary judgment motions addressing Nath's new claim in the Main Suit.[14] Nath did not file written responses to these motions, and instead chose to object to the notice of hearing

---

[10] *See* Plaintiff's Response to Baylor's Summary judgment and No-Evidence Motion for Summary Judgment, filed Mar. 26, 2010.

[11] *See* Baylor's Reply in Support of its Traditional and No Evidence Motion for Summary Judgment, filed Mar. 30, 2010.

[12] The sanctions award excludes the fees Baylor incurred in defending the motion to recuse. Texas Rule of Civil Procedure 18a(h) requires sanctions for such motions to be heard by the judge hearing the motion to recuse.

[13] Plaintiff's Sixth Amended Petition, filed Apr. 14, 2006; Transcript of June 18, 2010 Hearing at 41 (attached as Exhibit F to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath).

[14] Baylor's Supplemental Traditional and No Evidence Motion for Summary Judgment, filed May 24, 2010.

65518170.6

5

64

based on a technical argument that Defendants' notices were improper because they were electronically signed (despite the fact that the rules specifically permit electronic signatures).[15]

14) On June 18, 2010, this Court heard argument on, and granted, all of Defendants' motions for summary judgment. Counsel for all parties were present. This Court dismissed all of Nath's claims asserted against Baylor and Texas Children's Hospital in Plaintiff's Fifth and Sixth Amended Petitions.

15) On August 12, 2010, Texas Children's Hospital nonsuited in the Main Suit its claims against Nath for statutory attorney's fees based on the Uniform Declaratory Judgments Act, Section 37.009 of the Civil Practice and Remedies Code; and the Texas Medical Practice Act, Section 160.008(c) of the Texas Occupations Code.

16) On August 26, 2010, Texas Children's Hospital filed in the Main Suit a Motion to Modify the Judgment to Assess Fees As Sanctions Against Plaintiff Rahul K. Nath. Nath retained another new attorney, Susan Norman, who wrote to the Court on August 21, 2010 asking for additional time so that another new attorney retained by Nath, Scott Rothenberg, could review the file in order to determine the time frame for completing a response to the motion. On September 3, 2010, Nath's counsel filed in the Main Suit Special Exceptions to the Motion for Sanctions.[16]

---

[15] Objection to Notices, filed June 18, 2010.
[16] On September 17, 2010, the Court held a hearing in the Main Suit regarding Texas Children's Hospital's Motion for Sanctions and Nath's Special Exceptions. The Court overruled the Special Exceptions, and granted sanctions in the Main Suit for the reasons set forth in the November 8, 2010 Findings of Fact and Conclusions of Law. *See also* Transcript of Sept. 17, 2010 hearing, attached as Exhibit B to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.

65518170.6

6

: 00463

17) On September 8, 2010, Nath moved to sever Baylor and Nath from the Main Suit .[17] On September 10, 2010, the Court singed an agreed order severing Baylor and Nath into this action, Cause No. 2006-10826-A (hereinafter referred to as "Severed Suit").

18) On September 15, 2010, Nath filed a Verified Motion for New Trial in the Severed Suit.

19) On October 8, 2010, Baylor filed its Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath in the Severed Suit. On October 14, 2010, Baylor filed its Notice of Oral Hearing on the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath. The hearing on the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath was noticed for November 12, 2010.

20) On November 2, 2010, Nath filed a new Designation of Attorney in Charge. That same day, Nath withdrew his Motion for New Trial in the Severed Suit.[18]

21) On November 12, 2010, the morning of the hearing, Nath filed his response to the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.

22) At the November 12, 2010 hearing, the Court took judicial notice of the entire file in this case, Case Nos. 2006-10826 and 2006-10826-A. As a result of the judicial notice, the entire case file, Case Nos. 2006-10826 and 2006-10826-A, including all pleadings, hearing transcripts, filings, motions, responses, replies, and exhibits and attachments thereto, were considered in connection with the Motion for Sanctions and Motion to Modify the

---

[17] Motion to Sever by Plaintiff Rahul K. Nath Agreed to by Defendant Baylor College of Medicine, filed Sept. 8, 2010.

[18] Plaintiff's Unconditional Withdrawal of his Previously Filed Verified Motion for New Trial, filed Nov. 2, 2010.

65518170.6

7

: 00484

Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath. The Court also heard arguments and admitted evidence on the issues set forth herein.

23) On December 9, 2010, Nath requested that this Court enter findings of fact and conclusions of law.[19] On January 4, 2011, Nath again requested that this Court enter its findings of fact and conclusions of law by January 18, 2011.[20]

24) On December 20, 2010, Nath moved for a new trial and moved to modify, correct, or reform the Court's November 19, 2010 order and modified final judgment.[21]

***Relevant Factual Background to the Litigation***

25) Nath started his employment with Baylor in 1996 as an Assistant Professor in the Department of Surgery, Division of Plastic Surgery.[22] In 1997, Baylor granted Nath a joint primary appointment in the Departments of Surgery and Neurosurgery. During his time at Baylor, Nath was accountable to and reported to Dr. Shenaq, the Chief of Baylor College of Medicine's Division of Plastic Surgery.[23]

26) Nath also joined the Obstetrical Brachial Plexus Clinic at Texas Children's Hospital ("Clinic").[24] In 1996, the Baylor doctors staffing the Clinic included: Dr. Rita Lee (a neurologist and the appointed chief of the Clinic); Dr. Shenaq (head of plastic surgery at the Clinic); Nath (as a member of the plastic surgery team); Dr. John Laurent (the primary neurosurgeon for the Clinic); and Dr. Aloysia Schwabe (a physical medicine and

---

[19] *See* Nath's Request for Findings of Fact and Conclusions of Law, filed December 9, 2010.
[20] *See* Nath's Notice of Past Due Findings of Fact & Conclusions of Law, filed January 4, 2011.
[21] *See* Nath's Motion for New Trial and Motion to Modify, Correct, or Reform the Court's November 19, 2010 Order and Modified Final Judgment.
[22] *See* Deposition of Rahul Nath, M.D. Volume II at 7, attached as Exhibit A to Baylor's Traditional and No Evidence Motion for Summary Judgment and as Exhibit C to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath (hereinafter "Nath II at __").
[23] Nath II at 7.
[24] Nath II at 8.

: 00465

rehabilitation physician).[25] The staff at the Clinic also included Lisa Thompson, a Baylor employee, and Lisa Davis, a Texas Children's Hospital employee.[26]

27) Dr. Shenaq and Nath contracted with the Pediatric Consultants of the Department of Pediatrics, Baylor College of Medicine, to collect patient fees related to their practice at the Clinic.[27] Fifteen percent of the collections were distributed to Baylor and the Department of Pediatrics at Baylor, and the remaining 85% of patient fees were split equally between Dr. Shenaq and Nath as partners.[28]

28) Starting in late 2003, Nath's relationships with his fellow doctors and clinical workers began to sour. A number of doctors lodged complaints about Nath, including Dr. Lee and Dr. Gurpreet Dhillon, Dr. Arturo Armenta, and others. Those complaints are detailed in the pleadings and other papers filed in this case.[29]

29) In June, the conflicts among Nath and other Baylor physicians came to a head. On June 2, 2004, Dr. Brunicardi and Dr. Robert Grossman, Chairman of the Department of Neurosurgery, sent a letter to Nath notifying him of Baylor's decision not to renew his appointments in the Departments of Surgery and Neurosurgery.[30] The letter informed Nath that his last day of employment with Baylor would be June 30, 2004.[31] Although Baylor had a policy setting forth a procedure for non-tenured faculty to complain of grievances, Nath did not file a grievance.[32]

---

[25] Texas Children's Hospital Motion for Summary Judgment ("TCH Traditional MSJ"), Affidavit of Mark W. Mullarkey ¶ 3.
[26] TCH Traditional MSJ, Mullarkey Affidavit ¶ 3, Ex. 10-11.
[27] TCH Traditional MSJ, Ex. L at BCM 00576.
[28] TCH Traditional MSJ., Ex. L at BCM 00576.
[29] See Nath II at 15-19, 21, 24, 26, 41, 47-52, Exs. 3, 4.
[30] Nath II at 45, 53, Ex. 5.
[31] Nath II at Ex. 5.
[32] Nath II at 57, 59.

65518170.6

9

: 00466

68

30) In response to his termination, Nath engaged the services of an attorney to communicate with Baylor on his behalf.[33] On June 8, 2004, David Bond, as attorney for Nath, sent a letter to the Deputy General Counsel for Baylor. In the letter, Nath—through Mr. Bond—complained that Dr. Shenaq had told Nath's colleagues that "Nath had been terminated for misconduct."[34] One week later, in another letter from Mr. Bond, Nath complained generally about "disparaging" remarks by Dr. Shenaq, surgery scheduling practices, and a message on an online message board allegedly posted by Dr. Lee.[35]

31) In June/July 2004 Nath incorporated the Texas Nerve and Paralysis Institute, where he continued to practice his brachial plexus subspecialty.[36]

32) In April 2004, in the wake of the complaints of Dr. Lee, Dr. Armenta, and others, a subcommittee of the Medical Executive Committee of Texas Children's Hospital commenced a confidential and privileged peer review of the Clinic.[37] Then, in late 2004, Baylor suffered a loss in the deaths of two brachial plexus physicians, Drs. Lee and Laurent.

33) In light of these losses and the information ascertained in the confidential investigation, Dr. Feigin explained in a letter dated December 13, 2004, that the Clinic operations would be "suspended until TCH [could] ensure the availability of a team of pediatric subspecialists to provide a thorough, multidisciplinary review for all Clinic patients."[38] The Clinic has not reopened since. Since 2005, both Drs. Shenaq and Feigin passed away.

---

[33] Nath II at 59, 61-66, Exs. 7-9.
[34] Nath II at 59, 61-66, Exs. 7-9.
[35] Nath II at 59, 61-66, Exs. 7-9.
[36] Nath II at 53-56, 60.
[37] TCH's Traditional MSJ, Ex. 4 at 62-63, 66-67.
[38] TCH's Traditional MSJ, Ex. X.

65518170.6

10

: 00467

34) In contrast, Nath's private medical practice flourished. Nath admitted he performed at least 800 to 900 surgeries in the four years between the opening of his private practice in July 2004 and his deposition in September 2008.[39] Nath's accountant has represented that Nath earned taxable income "in the low to mid-seven figure range" in 2004, 2005, and 2006, income sufficient to enable him to purchase a home costing in excess of $8 million in Houston's Shadyside neighborhood.[40] Nath's former office manager, Brenda DeVaul, testified that by November of 2006, Nath had taken in gross receipts of $6 million for the year.[41] According to Ms. DeVaul, Nath bragged that "[t]here's no other doctor[] in the world, one doctor in a practice, that would make $6 million . . . in a year."[42]

35) Although the Brachial Plexus Clinic was closed and a moratorium was placed on all surgeries related to brachial plexus injuries, Dr. Nath retained his privileges to practice at Texas Children's Hospital.[43]

36) In June 2009, as part of its credentialing process, Texas Children's Hospital learned that Nath was actively being investigated by the Texas Medical Board, and that the board's Executive Director had authorized staff to pursue legal action against Nath.[44] On June 11, 2009, Texas Children's Hospital requested additional information from Nath related to these Texas Medical Board investigations, as well as copies of any documents he may have received from the board.[45] In response, Nath resigned his privileges at Texas

---

[39] TCH's Traditional MSJ, Ex. 1 at 15-19.
[40] TCH's Traditional MSJ, Ex. Y at NATH 000117, 000126.
[41] Deposition of Brenda DeVaul at 24-27, attached as Exhibit G to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.
[42] Id.
[43] TCH's Traditional MSJ, Ex. 4 at 51-52.
[44] See TCH's Traditional MSJ, Ex. EE (stating that four investigations were pending against Nath).
[45] TCH's Traditional MSJ, Ex. AA.

65518170.6

11

: 00468

Children's Hospital[46] and refused to provide additional information about the Texas Medical Board investigations.[47]

37) On August 28, 2009, the Texas Medical Board filed a public complaint about Nath seeking revocation of his medical license.[48] The complaint alleges that Nath ordered MRI scans of twenty children during the period 2002 through 2005.[49] The Texas Medical Board claims that, despite the poor quality of these images, Nath inappropriately billed the patients for performing and/or interpreting the MRI exams, creating MRI reports that were inaccurate and describing pathology that could not possibly be seen.[50] In addition, the complaint alleges that Nath performed unproven procedures and charged excessive fees—in one instance, $25,500 for a 17-minute procedure (amounting to a rate of $1,500 per minute).[51] Nath has since filed suit against two members of the Texas Medical Board, alleging that the board's adherence to statutory procedures violates his constitutional rights.[52]

*The Sanctions Hearing in the Severed Suit and the Court's Judicial Notice of the Case File[53]*

38) The hearing on Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath in the Severed Suit took place on November 12, 2010.

---

[46] *See* TCH's Traditional MSJ, Ex. Z (resigning privileges on July 3, 2009).
[47] TCH's Traditional MSJ, Ex. BB.
[48] TCH's Traditional MSJ, Ex. V.
[49] TCH's Traditional MSJ, Ex. V at 2.
[50] TCH's Traditional MSJ, Ex. V at 2.
[51] TCH's Traditional MSJ, Ex. V at 2.
[52] Transcript of September 18, 2010 hearing at 18-19, attached as Exhibit B to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.
[53] The Court's Findings of Fact and Conclusions of Law in the Main Suit detail the facts regarding the sanctions hearing in the Main Suit.

65518170.6

12

: 00469

39) At the November 12, 2010 hearing, the Court took judicial notice of the entire file in both the Main Suit and the Severed Suit. As a result of the judicial notice, the entire case file, including all pleadings, hearing transcripts, filings, motions, responses, replies, and exhibits and attachments thereto, were considered in connection with the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.[54]

40) At the November 12, 2010 hearing, the Court also heard admitted evidence that Baylor offered in support of its Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath. This evidence included affidavits from Baylor's Attorney Shauna Johnson Clark, as well as Nath's previously filed affidavits and verified interrogatory answers.

41) At the November 12, 2010, 2010 hearing, Nath's counsel was presented with the opportunity to rebut the evidence in the case file about Nath's conduct and motives throughout this litigation. His counsel declined to present any rebuttal evidence. Nath did not provide any testimony regarding his good faith. As a result, the evidence of Nath's bad faith conduct was unrebutted.

42) The Court finds that, as set forth below, all the evidence necessary to sanction Nath is before the Court. In support of the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath, Baylor cited to at least seventeen filings in this case, three transcripts from hearings in this case, four · exhibits, and three depositions, including at least eighteen references to Nath's

---

[54] With respect to the pleadings, motions, and responses. and replies, the Court took judicial notice that they had been filed in the case, but did not take judicial notice of the truth of the allegations therein.

65518170.6

13

: 00470

deposition.[55] Sanctions against Nath are further supported by his affidavit, of which the Court has taken judicial notice and admitted into evidence during the November 12, 2010 hearing, for the reasons set forth below. Finally, the Court has witnessed much of this behavior firsthand. The assessment of sanctions is based on: Nath's improper purposes in filing the pleadings in this case; the lack of any evidentiary support for his claims; and his groundless pleadings and the bad faith and harassment that his actions manifest.

*The Court Repeatedly Made It Clear that Nath Had No Standing or Grounds to Assert Issues Related to Dr. Shenaq's Health, Yet Nath Continued In Bad Faith to Press these Groundless Claims for The Improper Purpose of Personal Financial Gain*

43)     On several occasions, Nath sought privileged and confidential information from Baylor about Dr. Shenaq's health and the medical records of Dr. Shenaq's former patients. Nath's counsel claimed that Nath had a fiduciary duty to those patients to discover who they were, to discover whether Dr. Shenaq had health issues, and to inform them of Dr. Shenaq's alleged health issues, if they existed. Nath's counsel also tried to tie these discovery requests to his claim for declaratory judgment based on statutory duties to report medical misconduct to the Texas Medical Board. As set forth below, this Court repeatedly indicated that Dr. Shenaq's health was irrelevant to this lawsuit, and that issues related to Dr. Shenaq's health and the identity of his patients were best adjudicated before the Texas Medical Board in proceedings designed to protect the confidentiality of patient medical records.

44)     Nath's bad faith, harassment, and improper purpose in seeking from Baylor information about Dr. Shenaq's health and the medical records of his former patients is clear. On

---

[55] Nath's deposition was taken in two parts because he walked out of the first deposition when he became irritated by questions about his earnings and alleged lost profits. TCH Traditional MSJ, Ex. 1 at 22–25, 27–28.

65518170.6

14

: 00471

June 26, 2009, the eve of a mediation in this case, Nath sent a letter threatening Texas Children's Hospital with the consequences of failing to settle his claims:

> In the event that Dr. Shenaq did indeed have chronic active hepatitis B or a similar form of hepatitis, this would have been an absolute contraindication to his performing surgery. If this is the case, the sheer number of potentially affected patients would be substantial, given Dr. Shenaq's numerous years at Baylor and TCH. Moreover, the risks to each of these patients would be dire and would most certainly require prompt actions to notify patients so that they can undergo immediate testing and obtain legal counsel to advise them of their rights.
>
> . . .
>
> In summary, Dr. Nath is quite anxious to not only give his testimony but also to move forward with the entire discovery process (including numerous depositions) so that the truth can be made known. Dr. Nath also looks forward to confirming that all of the patients (and their parents, if they are minors) that may have been affected by the improper conduct described above have been notified so that they may have the opportunity to obtain the necessary medical testing and treatment as well as to determine what legal actions may be available to them or their children.[56]

It is clear to the Court from this letter, and from Nath's conduct in seeking discovery from Baylor about Dr. Shenaq's health and his patients, that the claims about Dr. Shenaq's health had nothing to do with any defamation of Nath, or any concern for Nath's fiduciary or statutory duties. The purpose of the discovery was to harass and to leverage a settlement.

45) At the July 24, 2009 hearing on one of Nath's motions to compel, in response to the suggestion that the Court should order Baylor to produce information identifying Dr. Shenaq's former patients so that Nath could inform the patients of Dr. Shenaq's alleged health problems, this Court stated:

---

[56] Letter from Bruce M. Flowers to Patrick W. Mizell dated June 26, 2009, at 7 (attached as Exhibit A to Texas Children's Hospital's Response to Plaintiff's Supplemental Motion to Compel Dated July 20, 2009, filed July 23, 2009).

65518170.6

15

: 00472

I can't do that. You can't do that. The State Medical Board could do that. Hospital Board, someone else. Somebody that's not here can do that. . . .

You should be before some other board that has a different authority than me. It shouldn't be used as a tool in your litigation. . . .

I'm wondering why you're asking me to uncover [Dr. Shenaq's alleged health issues and patients allegedly at risk] instead of the State Medical Board. That's my big issue with your approach to it. . . .

You're coming to me asking me to blow open this cover. When there is an agency out there that is well situated to deal with all of the [privilege] issues that you are raising . . . .[57]

This Court also pointed out that Nath could find out directly from his own patients if they had seen Dr. Shenaq.[58]

46)     At a hearing on another of Nath's motions to compel on January 21, 2010, this Court stated, in response to Nath's attorney's request that Baylor produce information that related to Dr. Shenaq's health:

I think—I answered that by saying Dr. Shenaq's condition is not in this suit. . . .

I think I was very clear about it last time. If I wasn't, I want to be clear now. . . .

And I think you're misunderstanding what I ruled last time, and that's why I want to reiterate. . . .

I said it's not relevant to this lawsuit. . . .

It's irrelevant to your lawsuit so it's not your job to do it. Your doctor has an obligation to report it to his medical board and they have a job to do. We don't.[59]

---

[57] Transcript of July 24, 2009 Hearing, at 16–17, 21, 48, attached as Exhibit D to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.
[58] Transcript of July 24, 2009 Hearing, at 17–21.
[59]Transcript of January 21, 2010 Hearing on Plaintiff's Motion for Continuance, at 42–43, 51-52, attached as Exhibit E to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.

65518170.6

16

: 00473

47)     Despite these rulings, Nath continued to seek information from Baylor regarding Dr. Shenaq's health. For example, with Nath present, Nath's counsel repeatedly sought to ask Dr. Samuel Stal about Dr. Shenaq's alleged health issues during Dr. Stal's deposition.[60] It appears that Nath was also interested in obtaining information about Dr. Shenaq's alleged health issues from the deposition of Dr. Larry Hollier.[61]

48)     On March 25, 2010, Nath submitted a verified affidavit in support of his response to Baylor's motion for summary judgment. In the affidavit, Nath goes to great lengths to describe Dr. Shenaq's alleged vision issue, and lists 45 patients whose surgeries he alleges may have been negatively affected by Dr. Shenaq's eyesight.[62]

49)     Based on the Court's observations at the hearings, Nath's allegations and affidavit, Nath's settlement demand, and the totality of the record, it is clear, and this Court finds as a matter of fact, that Nath was seeking to improperly use the alleged health problems of Dr. Shenaq for Nath's own financial advantage in a case where Nath had no standing to assert claims on behalf of Dr. Shenaq's patients and no legally cognizable basis for his own claims. Dr. Shenaq's health, and its possible effects on Dr. Shenaq's patients, have nothing to do with Nath and this litigation. Nath's conduct in attempting to use this information as a tool to extract a financial advantage in litigation was in bad faith, was harassing, and was done for an improper purpose, all of which the Court finds to be sanctionable.

---

[60] Mar. 3, 2010 Deposition of Dr. Samuel Stal (the "Stal Depo.") at 219, 249, attached as Exhibit H to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.
[61] Transcript of Mar. 19, 2010 Hearing on Motion for Continuance, at 28-29, 31-32. The Court granted an order compelling Dr. Hollier's testimony, but the deposition was postponed by Nath after Dr. Hollier expressed his preference to obtain independent counsel before proceeding.
[62] Affidavit of Rahul K. Nath, M.D., at ¶¶ 7, 21-23, 41-43, and Exhibit 1-B thereto (Mar. 25, 2010) (attached as Exhibit 1 to Plaintiff's Response to Baylor's Motion for Summary Judgment, filed Mar. 25, 2010).

65518170.6

17

: 00474

*Nath's Personal Involvement in the Litigation*

50) Having observed the arguments of Nath's counsel in hearings throughout the course of this litigation, reviewed the filings of his counsel, and reviewed the evidence submitted with the various filings, including Nath's deposition and his verified affidavit submitted in response to Baylor's motion for summary judgment, this Court finds as a matter of fact that Nath has taken a personal, participatory role in this litigation. Throughout the course of this litigation, and even before suit was filed,[63] Nath has been actively involved in prosecuting his grievances against Baylor and Texas Children's Hospital.

51) This Court finds that Nath is knowledgeable about the law and legal issues, having previously studied the law.[64]

52) Nath's signed and verified affidavit, submitted in support of his Response to Baylor's Motion for Summary Judgment, incorporates virtually the entire contents of his Fifth Amended Petition and expands on the theories set forth in the Petition.[65] This document indicates that Nath fully authorized, adopted, and ratified the facts and theories set forth in his petitions and pursued by his counsel.

53) The record reflects that Nath himself was highly focused on gathering evidence of Dr. Shenaq's alleged wrongdoing. Nath's counsel insisted on delaying trial so that Nath could be present at the depositions of Drs. Stal and Hollier, despite his busy medical practice.[66] According to his counsel, Nath's attendance was "vital" to help direct questioning of the

---

[63] *See, e.g.*, Nath II at Exs. 7-9.

[64] Sept. 30, 2008 Deposition of Rahul Kumar Nath, M.D., Volume 1 at 8-9 (attached as Exhibit E to TCH's Motion for Sanctions).

[65] Affidavit of Rahul K. Nath, M.D (attached as Exhibit 1 to Plaintiff's Response to Baylor's Motion for Summary Judgment, filed Mar. 25, 2010).

[66] *See* Jan. 21, 2010 Transcript at 53, 56-57, attached as Exhibit E to Baylor's Motion for Sanctions and Motion to Modify Judgment to Assess Fees as Sanctions Against Plaintiff Rahul Nath, M.D.

65518170.6

18

: 00475

deponents.[67] The deposition requests were based on Nath's understanding of the probable deposition testimony.[68] Nath's counsel stated that "he's been asking me for [] months" for the depositions of Drs. Stal and Hollier.[69] As set forth above, Nath was interested in these depositions primarily because of the advantage he believed he could gain from whatever the deponents might say about Dr. Shenaq.

54) The Court also finds that Nath personally met with at least one witness who was an employee of Baylor to discuss the witness's testimony. Nath's counsel conceded at the hearing on March 19, 2010, that Nath spoke with Dr. Hollier just prior to Hollier's deposition.[70] No attorneys were present at this conversation. After Nath's conversation with Dr. Hollier, Dr. Hollier stated he preferred not to continue with his deposition until he could obtain his own attorney. While this conversation with a party represented by counsel may not, in and of itself, have been improper, it is further evidence of Nath's personal involvement in this litigation.

55) The Court does not believe that Nath's attorneys alone, without Nath's knowledge, pursued the outrageous effort to use Dr. Shenaq's medical history and former patient records as a tool to further Nath's financial interests in this baseless litigation. Based on the record, it is obvious to the Court that Nath is the architect of the groundless, harassing, bad faith litigation strategy that was without evidentiary support and pursued for an improper purpose.

56) Further, the Court finds that this case is part of a pattern in which Nath has used the court system to harass adversaries and to stifle dissent with groundless legal allegations. Nath has

---

[67] *Id.* at 56-57
[68] *Id.* at 46–47.
[69] *Id.* at 56.
[70] Transcript of Mar. 19, 2010 Hearing on Motion for Continuance at 28–29, 31.

65518170.6

19

: 00478

78

sued Dr. Belzberg and Johns Hopkins in Maryland court; his former partner in an MRI venture; and his former partner Dr. Shenaq. Nath has also asserted claims in federal court in connection with the purchase of his home. Most recently, Nath sued two individuals associated with the Texas Medical Board, which is seeking to revoke his license to practice medicine.[71]

*Baylor's Attorneys' Fees*

57)     Baylor sought sanctions in the amount of $644,500.16 representing the amount of attorneys' fees it expended in retaining the law firm of Fulbright & Jaworski, LLP to defend it against Nath's frivolous claims, excluding legal work related to Nath's recusal motions and the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath. Considering the extensive discovery undertaken, the numerous discovery disputes presented to the Court, the extended rounds of summary judgment briefing, the duration of time in which this case has been pending, and the amount in controversy,[72] the Court finds that attorney's fees in the amount of $644,500.16 are reasonable and necessary in the defense of Baylor against Nath's claims.[73]

*The Relative Sensibilities of the Parties*

58)     The Court finds, as a matter of fact, that a large sanction is required to sufficiently punish Nath's conduct and deter similar conduct in the future.

---

[71] Nath's service as a professional witness in hundreds of medical malpractice cases involving brachial plexus injuries further calls into question his credibility. In these cases, Nath purports to disclaim any obstetrical expertise but nonetheless opines that the obstetrician negligently caused the injury. He charges up to $2,500 per hour for such testimony. In evaluating whether to levy sanctions, a court should consider "the credibility of the party or attorney against whom sanctions are requested." *Campos v. Ysleta Gen. Hosp., Inc.*, 879 S.W.2d 67, 71 (Tex. App.—El Paso 1994, writ denied).

[72] *See* Expert Witness Report of Rodney W. Sowards at 5 (attached as Exhibit 21 to Plaintiff's Response to Baylor College of Medicine's Motion for Summary Judgment and No-Evidence Motion for Summary Judgment, filed Mar. 30, 2010).

[73] The fees incurred and paid by Baylor are proven by the affidavit of Shauna Johnson Clark of which the Court took judicial notice.

65518170.6

20

: 00477

59) Nath's office manager testified that Nath took in more than $6 million in 2006.[74] This figure was corroborated by a letter from Nath's account that indicates that from 2004 to 2007, Nath "[g]enerated taxable income in the low to mid seven figure range" and had sufficient liquid assets in 2007 to acquire an $8 million residence.[75]

60) The Court further finds that Baylor College of Medicine, an academic medical school, has incurred a substantial amount of legal fees defending against Nath's claims in this lawsuit. The fees incurred by Baylor total more than $$644,500.16.

## CONCLUSIONS OF LAW

61) While Nath has a right to petition the courts for redress of legitimate grievances, he does not have a right to bring baseless litigation in bad faith or for improper purposes. As set forth herein, Nath's actions in this lawsuit merit that he be required to pay Baylor attorney's fees as a sanction for his conduct.

*Applicable Legal Standards*

62) The court has broad discretion to award sanctions. *Delgado v. Methodist Hosp.*, 936 S.W.2d 479, 487 (Tex. App.—Houston [14th Dist.] 1996, no writ) (stating that a trial court's award of sanctions is reviewed for abuse of discretion). "The degree of discretion afforded the trial court is . . . greater when sanctions are imposed for groundless pleadings than when imposed for discovery abuse." *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 827 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). The law grants courts the power to sanction litigants in order to secure compliance with the rules, punish rule-breakers, and deter future litigants from violating the rules. *Delgado*, 936 S.W.2d at 488. The court's

---

[74] Duval Depo at 25-26, attached as Exhibit G to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.
[75] TCH's Traditional MSJ, Ex. Y at NATH 000126.

65518170.6

21

: 00478

power to levy sanctions is derived from Chapter 10 of the Civil Practice and Remedies Code and from Rule 13 of the Rules of Civil Procedure. While these authorities overlap considerably, each has its own test the court must apply before issuing sanctions.

63) Under Chapter 10, a court may impose monetary sanctions upon a showing that a party has filed a pleading for an improper purpose *or* asserted a claim without evidentiary support. TEX. CIV. PRAC. & REM. CODE §§ 10.001(1), (3); 10.004(a).[76] To comply with Chapter 10, the party and the attorney filing the pleading must undertake a "reasonable inquiry" to ensure the pleading does not violate the Chapter 10 prohibitions. *Id.* at § 10.001. For instance, the filing party and attorney must make a reasonable inquiry to ensure a pleading is not filed for an improper purpose, such as to harass, delay, or increase the cost of the litigation. *Id.* at § 10.001(1). In addition, the filing party and attorney must undertake a reasonable inquiry to make certain the claims set forth in the filing have evidentiary support. *Id.* The assertion of a claim that lacks any evidentiary support is sanctionable under Chapter 10. TEX. CIV. PRAC. & REM. CODE § 10.001(3); *see also Sellers v. Gomez*, 281 S.W.3d 108, 115 (Tex. App.—El Paso 2008, no pet.) (upholding Chapter 10 sanctions where plaintiff filed claim with knowledge there was no evidence of a necessary element).

64) A party seeking sanctions under Rule 13 must show that the pleading is groundless and filed in bad faith or for purposes of harassment. TEX. R. CIV. P. 13. Like Chapter 10, Rule 13 requires that the filing party perform a "reasonable inquiry" to ensure a pleading is not groundless or filed in bad faith. *Id.* A groundless pleading has "no basis in law or fact and

---

[76] The Court recognizes that a party cannot be monetarily sanctioned for a violation of Section 10.001(2), which requires a reasonable inquiry that each claim or legal contention be warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law. *See* TEX. CIV. PRAC. & REM. CODE § 10.004(d). Although the pleadings do violate Section 10.001(2), the Court's assessment of sanctions is based on violations of Sections 10.001(1) and (3) and TRCP 13, as set forth herein.

65518170.6

22

: 00479

[is] not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* Groundlessness, therefore, "turns on the legal merits of a claim." *Robson v. Gilbreath*, 267 S.W.3d 401, 405 (Tex. App.—Austin 2008, pet. denied). In determining if a claim is groundless, the trial court examines the facts and circumstances at the time of filing. *Id.* A claim without evidentiary support is groundless for purposes of Rule 13, as it has no basis in fact or law. *See Delgado*, 936 S.W.2d at 487–88 (finding IIED claim groundless and filed in bad faith where plaintiff presented no evidence of "extreme and outrageous" conduct).

65) Before imposing Rule 13 sanctions on the basis of groundlessness, the trial court must also determine that the groundless claim was filed in bad faith or for the purpose of harassment. TEX. R. CIV. P. 13. "A party acts in bad faith when discovery puts him on notice that his understanding of the facts may be incorrect, and he does not make reasonable inquiry into the facts before filing a pleading." *Robson*, 267 S.W.3d at 407. A court may accordingly find bad faith where a party asserts a claim with knowledge that the evidence fails to support the claim. *Id.*; *see also Attorney Gen. v. Cartwright*, 874 S.W.2d 210, 215–16 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (affirming trial court's findings of groundlessness and bad faith where the Attorney General repeatedly failed to produce evidence essential to its cause of action).

66) "Generally, a sanction cannot be excessive nor should it be assessed without appropriate guidelines." *Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007). The Texas Supreme Court has indicted that the following "nonexclusive list" of factors, compiled by the American Bar Association, are "relevant" and "useful to this type of analysis":

a.      the good faith or bad faith of the offender;

65518170.6

23

: 00480

82

b.    the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

c.    the knowledge, experience, and expertise of the offender;

d.    any prior history of sanctionable conduct on the part of the offender;

e.    the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

f.    the nature and extend of prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

g.    the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

h.    the risk of chilling the specific type of litigation involved;

i.    the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

j.    the impact of the sanction on the offended party, including the offended person's need for compensation;

k.    the relative magnitude of sanction necessary to achieve the goal or goals of the sanction;

l.    the burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

. . . .

n.    The degree to which the offended person's own behavior caused the expenses for which recovery is sought. . . .

*Id.* at 620 & n.5. A court need not "address all of the[se] factors," but "should consider relevant factors in assessing the amount of the sanction." *Id.* at 620. In addition, the determination of the amount of a penalty assessed under Chapter 10 should "begin with an acknowledgement of the costs and fees incurred because of the sanctionable conduct." Attorney's fees "provide[] a monetary guidepost of the impact of the conduct on the party seeking sanctions and the burdens on the court system." *Id.*

65518170.6

24

: 00481

67) This sanctions award is based on the totality of Nath's conduct throughout this litigation, both in the Main Suit and the Severed Suit, as set forth herein. The law is clear that sanctions may be assessed based on cumulative conduct throughout a litigation. *See, e.g., In re M.I.L.,* No. 2-08-349-CV, 2009 WL 1740066, at *3 (Tex. App.—Fort Worth June 18, 2009, no pet.) (affirming sanctions assessed under CPRC § 10, based on the sanctioned party's "testimony, on the frivolous pleadings on which the trial court had granted summary judgment, and on [the sanctioned party's] pattern of conduct"); *Falk & Mayfield L.L.P. v. Molzan,* 974 S.W.2d 821, 826 (Tex. App.-Houston [14 Dist.] 1998, pet. denied) (holding that the trial judge was "entitled to consider the entire history of the case before him" in assessing sanctions for filing of groundless defamation claims).

68) The Court, in granting Baylor's motions for summary judgment on all of Nath's claims, has affirmatively concluded that Nath's claims were without substantive merit. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex. 1979) ("The trial court may not grant a [traditional] summary judgment by default for lack of an answer or response to the motion by the non-movant when the movant's summary judgment proof is legally insufficient. The movant still must establish his entitlement to a summary judgment on the issues expressly presented to the trial court by conclusively proving all essential elements of his cause of action or defense as a matter of law."). In accordance with *Clear Creek,* the Court concluded, based on ample summary judgment proof, that Baylor's motions for summary judgment were meritorious and should be granted.[77] Some of the reasons for that determination are set forth below.

---

[77] *See* Order Granting Defendant Baylor College of Medicine's traditional and no evidence motions for summary judgment, filed June 18, 2010.

65518170.6

25

*Nath's IIED Claims Were Groundless, Brought in Bad Faith, and Lacked Evidentiary Support*

69)     Nath's IIED claim was, on its face, completely lacking in factual support and therefore barred by established Texas law. *See Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 815 (Tex. 2005); *Hoffman-LaRoche Inc. v. Zeltwanger,* 144 S.W.3d 438, 445 (Tex. 2004). There is nothing "extreme" or "outrageous" about the types of conduct Nath alleged, which included claims that:

   a.     Dr. Rita Lee, a Baylor physician, posted on an internet message board that Nath had disappeared from the Clinic without notice;[78]

   b.     Dr. Ralph Feigin, a Baylor physician acting as editor for a pediatrics journal, decided against publishing an article that Nath had co-authored;[79]

   c.     Nath's patients were referred to Dr. Saleh Shenaq, Nath's partner;[80]

   d.     Lisa Thompson, a Baylor employee, told a parent of a minor patient that Nath was "a terrible doctor;"[81]

   e.     Dr. Shenaq, Nath's co-worker and supervisor at Baylor, referred to Nath as a "cancer that needed to be cut out."[82]

70)     Given the amount of discovery that had been conducted in the case prior to his assertion of the IIED claim, it is evident that Nath asserted the claim with full knowledge that he could not possibly satisfy his evidentiary burden. Additionally, Nath admitted under oath, prior to filing the Sixth Amended Petition, that he did not suffer the type of severe emotional distress required to prove an IIED claim. In his deposition, Nath testified that he was merely "worried" (principally about the lawsuit that *he* instigated).[83] He also testified that the

---

[78] Nath II at 78-79.

[79] Sixth Amended Petition at 4.

[80] Sixth Amended Petition at 12; Nath II at 117.

[81] Nath II at 124–125.

[82] Sixth Amended Petition at 11.

[83] Nath II at 166-168.

65518170.6

26

: 00483

Defendants' alleged conduct affected him in "subtle" ways, and that he had not sought out the help of any medical professional.[84]

71) Nath's failure to allege any "extreme and outrageous" conduct or severe emotional distress were not only fatal to the IIED claim; these failures also demonstrate that the claim was groundless, brought in bad faith, and lacked evidentiary support. *See Delgado*, 936 S.W.2d at 486–88 (finding plaintiff's IIED claim groundless due to the plaintiff's failure to allege "extreme and outrageous" conduct).

72) Finally, Texas law absolutely prohibits a plaintiff from asserting a claim for IIED when the gravamen of the action sounds in another tort. *See Zeltwanger*, 144 S.W.3d at 447 (describing IIED as a "gap-filler" tort); *Creditwatch*, 157 S.W.3d at 818 ("[IIED] was never intended as an easier and broader way to pursue claims already protected by [Texas's] expanding civil and criminal laws."). This is a well-settled principle of Texas case law. *See, e.g.*, MICHOL O'CONNOR, O'CONNOR'S TEXAS CAUSES OF ACTION (2009) at 371. Nath simply repackaged his previous pleading for defamation, and re-labeled it as a new cause of action. Texas law prohibits this, and the barest of legal inquiries would have revealed as much. *See, e.g.*, O'CONNOR'S at 371 (citing three Supreme Court opinions). Because Nath's IIED claim runs directly contrary to established Texas law, it is groundless and in bad faith, and lacks evidentiary support. *See Stites v. Gillum*, 872 S.W.2d 786, 794 (Tex. App.—Fort Worth 1994, writ denied) (finding plaintiff's claim groundless where the cause of action had previously been abolished); *see also Thottumkal v. McDougal*, 251 S.W.3d 715, 718 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)

---

[84] Nath II at 166–168. *See also* Baylor's Supplemental Traditional and No-Evidence Motion for Summary Judgment, filed May 24, 2010 (setting out Nath's lack of severe emotional distress).

65518170.6

27

: 00484

(finding claim groundless where reasonable inquiry would have revealed claim was barred by law).

*Nath's Defamation Claims Were Groundless, Brought in Bad Faith, and Lacked Evidentiary Support*

73)    If Nath had performed any inquiry at all into his defamation claims prior to asserting them, he would have discovered that these claims were also groundless and lacked evidentiary support, as they were time-barred and nondefamatory in nature.

74)    Texas imposes a one-year limitations period for defamation claims. TEX. CIV. PRAC. & REM. CODE § 16.002(a). Nath's defamation claims clearly fall outside of the one-year period. This was a fact well-known to Nath, as he had engaged an attorney to undertake a letter writing campaign in response to the allegedly defamatory statements almost two years before filing suit. The following are some examples of Nath's patently time-barred claims:

a.    On June 2, 2004, Nath received a letter from Drs. Grossman and Brunicardi of Baylor terminating his employment contract. Nath complained about the termination letter through his attorney on June 7, 2004, well over one year before filing suit.[85]

b.    Nath claimed that Dr. Rita Lee of Baylor defamed him in a post she allegedly made in June 2004 on an internet message board for the United Brachial Plexus Network.[86] Nath's attorney complained to Baylor about Dr. Lee's posting on June 15, 2004.[87]

c.    Nath alleged that Dr. Shenaq made oral misstatements that Nath was fired for inappropriate conduct.[88] Nath also claimed that Dr. Shenaq republished the Nath termination letter in the Texas Children's Hospital operating room.[89] Nath, through his attorney, complained about these alleged statements at least twice by

---

[85] Nath II at Ex. 7.
[86] Nath II at 78–79.
[87] Nath II at Ex. 9.
[88] Nath II at 78 -79, 81.
[89] Nath II at 86.

65518170.6

28

: 00485

letters dated June 8, 2004, and June 15, 2004.[90] Yet Nath did not bring suit until more than a year later.

    d.    Nath claims that Lisa Thompson, a Baylor employee, told the parent of a patient that Nath was fired from Baylor for misconduct.[91] He also alleged that Ms. Thompson told the parent that she had not seen Nath in weeks, that he was a "terrible doctor," and that he was being investigated by Texas Children's Hospital.[92] Nath admitted he learned of these statements in June or July of 2004; they are time- barred.[93]

    e.    While Nath did not allege exactly when Lisa Davis made alleged statements about him to the parent of a patient, he admitted that the parent contacted him by telephone in June or July of 2004 and told him about the statements.[94] The parent also purportedly sent Nath an email concerning the statements on June 30, 2004, relaying the alleged conversation with Ms. Davis.[95]

75)    Nath did not file this lawsuit until February 17, 2006. Most of these allegedly defamatory statements occurred in June or July of 2004, and all of the alleged defamatory statements would have occurred prior to the end of 2004, when Texas Children's Hospital closed the Brachial Plexus Clinic. Nath was concerned enough to hire legal counsel to respond in writing to at least three of the five above-described defamation claims. He had to have been cognizant of the fact that he needed to respond in a timely manner. Yet he waited until the statute of limitations period had expired before bringing these claims. Where a reasonable inquiry would have revealed that a claim was barred by the applicable statute of limitations, the claim is groundless and/or lacks evidentiary support.[96] *See McDougal*, 251 S.W.3d at 718 (noting that a time-barred claim is a groundless claim where a reasonable inquiry would have revealed the claim was time-

---

[90] Nath II at Exs. 7, 9.

[91] Nath II at 97–98.

[92] Nath II at 125.

[93] Nath II at 125, 184.

[94] Nath II at 184.

[95] TCH Traditional MSJ, Exhibit N.

[96] Nath's claims of negligence and tortious interference are also groundless to the extent that those claims rely on time-barred, allegedly defamatory statements.

65518170.6

29

: 00486

barred); *Dolenz v. Boundy*, 197 S.W.3d 416, 422 (Tex. App.—Dallas 2006, pet. denied) (affirming sanctions where plaintiff "was aware of the applicable statute of limitations").

76) Additionally, many of Nath's defamation allegations consisted of statements that were, on their face, nondefamatory. For example:

a.  Dr. Rita Lee posted on an internet message board that Nath had disappeared from the Clinic without notice;[97]

b.  Drs. Shenaq and Michael Klebuc allegedly told the parent of a patient that Nath had "gone into research";[98]

c.  Lisa Thompson, a Baylor employee, allegedly told a parent of a patient that Nath had "disappeared";[99]

d.  Dr. Shenaq allegedly told a parent of a patient that Nath had disappeared and left no forwarding address.[100]

77) There is simply nothing defamatory about these types of statements. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 921 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (noting that to qualify as defamatory, a statement must be an egregious affront to a party's honesty, integrity, reputation, or virtue). Because people are generally free to speak their opinions, "[a] statement may be false, abusive, unpleasant, and objectionable . . . without being defamatory." *Molzan*, 974 S.W.2d at 824 n.2 (quoting *Schauer v. Mem'l Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.—Houston [1st Dist.] 1993, no writ)). The absurdity of claiming that the alleged statements constitute defamation supports the conclusion that these claims lacked evidentiary support, and were groundless and brought in bad faith, and therefore subject to sanctions under Chapter 10 and Rule 13. *Molzan*, 974 S.W.2d at 824 (upholding findings of groundlessness and bad faith

[97] Nath II at 78–79.
[98] Nath II at 100–101.
[99] Nath II at 123–124.
[100] Nath II at 119, 122.

65518170.6

30

:00487

where defamation claim was "blatantly vacuous"); *Delgado*, 936 S.W.2d at 487–88 (affirming Rule 13 sanctions where plaintiff claimed that hospital's staff's denial of a private room supported a claim for IIED).

*Nath's Declaratory Judgment Action Was Wholly Groundless, Brought in Bad Faith, And Lacked Evidentiary Support*

78) By filing his declaratory judgment action, Nath purportedly sought some sort of declaration of his "rights, interests, and duties" with respect to both his own patients, as well as to former patients of the deceased Dr. Shenaq, who Nath claimed may have been affected by Dr. Shenaq's alleged impaired vision and hepatitis.[101] Nath sought to have the Court order declaratory relief, as he put it, so that Dr. Shenaq's patients could "potentially obtain legal counsel to advise them of their rights."[102]

79) The Texas Civil Practice and Remedies Code, codifying the Uniform Declaratory Judgment Act ("UDJA"), defines when a party may put forth an action for declaratory judgment:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004. As the Court has previously concluded, the UDJA simply does not apply to Nath's allegations.

80) Nath purported to ground his right to declaratory judgment on section 160.003 of the Texas Occupations Code, which directs a person subject to the Code to "report relevant information to the [Texas Medical] board relating to the acts of a physician in this state if,

---

[101] Fifth Amended Petition at 22–23.
[102] Nath MSJ Response at 68.

65518170.6

31

∷ 00488

in the opinion of the person . . . that physician poses a continuing threat to the public welfare through the practice of medicine." TEX. OCC. CODE § 160.003. Citing this statute, Nath apparently sought an order from the Court directing him to adhere to the Texas Occupations Code with respect to his allegations concerning the health of Dr. Shenaq. However, merely citing to a statute does not satisfy the requirements of the UDJA. To bring a declaratory judgment action, the statute in question must involve a "question of construction or validity" affecting the party's "rights, status, or other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.004.

81)     The intersection of Texas Occupations Code section 160.003 and the alleged health problems of Dr. Shenaq does not raise any questions regarding the "construction or validity" of the statute, and does not affect any "right, status, or legal relation" belonging to Nath. In fact, the very statute that Nath cites plainly sets out his responsibility—as a physician—with respect to this situation. This Court pointed out as much at the hearing on Nath's first motion for continuance.[103]

82)     Nath pointed to no "question of construction or validity" that concerned his "rights, status, or other legal relation[]" affected by the Texas Occupations Code. In fact, his citation to the Texas Occupations Code was little more than a last-ditch effort to avoid summary judgment.[104] Because he clearly lacked a factual basis to bring the claim in the first instance, his declaratory judgment claim lacked evidentiary support, had an improper purpose, and was groundless and in bad faith. See Mosk, 183 S.W.3d at 696 (upholding trial court's determination that DTPA claim was groundless and frivolous where plaintiff

---

[103] Transcript of Jan. 21, 2010 Hearing, at 51–52, attached as Exhibit E to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath.

[104] Nath only cited to this section in his response to the initial motions for summary judgment. Compare Fifth Amended Petition at 22–23 with Nath MSJ Response at 68–70.

65518170.6

32

: 00489

lacked standing to bring a DTPA claim); *see also Delgado*, 936 S.W.2d at 487–88 (affirming sanction imposed where IIED claim failed as a matter of law because the plaintiff did not allege or provide evidence of "extreme and outrageous" conduct).

*Nath Prosecuted this Groundless Lawsuit in Bad Faith and For an Improper Purpose*

83) The Court concludes that, as set forth above, Nath brought this groundless case in bad faith, without evidentiary support and for an improper purpose, to obtain a financial windfall based on alleged wrongdoings of Dr. Shenaq that have nothing to do with Nath, and to harass Baylor. The Court also concludes that Nath's repeated efforts to delay proceedings in this case, as set forth above, evidence bad faith, harassment, and an improper purpose. Nath's improper purposes provide an independent ground for sanctions under Chapter 10. TEX. CIV. PRAC. & REM. CODE § 10.001(a) (providing for sanctions where a pleading is filed for an improper purpose). Furthermore, the Court concludes that his bad faith satisfies the second prong of the test for levying sanctions under Rule 13. TEX. R. CIV. P. 13; *Robson*, 267 S.W.3d at 407.

84) As described above, Nath's baseless declaratory judgment claim evidences his bad faith and improper purpose in prosecuting this lawsuit. As the Court has observed firsthand, Nath prosecuted the declaratory judgment claim in a fruitless effort to open a discovery front into the alleged health issues of Dr. Shenaq and to discover the identities of Dr. Shenaq's patients.[105] Nath openly admitted in his Fifth Amended Petition that he hoped to use this lawsuit to discover Dr. Shenaq's patients so that he could help them "obtain legal counsel to advise them of their rights."[106] Nath himself carried out this strategy in the affidavit he filed

---

[105] *See. e.g..* Transcript of Jan. 21, 2010 Hearing, at 42–45, attached as Exhibit E to Baylor's Motion for Sanctions and Motion to Modify Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath, M.D..
[106] Fifth Amended Petition, at 24.

65518170.6

33

: 00490

92

with the Court.[107]  As this Court has previously found, Nath was plainly trying to use Dr. Shenaq's health and patient information and the threat of patient lawsuits as "as a tool in [his] litigation" to gain a financial advantage in settlement negotiations.[108]  Accordingly, this Court—on more the one occasion—explicitly advised Nath's counsel that the health of Dr. Shenaq was not relevant and not at issue in this lawsuit.[109]  In spite of this Court's admonitions, Nath, through his counsel, continued to pursue Dr. Shenaq's alleged health issues.  Nath's act of doggedly pursuing his groundless declaratory judgment claim under false pretenses, for his own financial gain, is further evidence that his improper motives in this suit warrant sanctions. *See* TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE § 10.001; *cf. Wallace v. Inv. Advisors, Inc.*, 960 S.W.2d 885, 889 (Tex. App.—Texarkana 1997, pet. denied) (affirming sanctions where the plaintiff "used an improper method to attempt to obtain evidence for a matter not involved in the present litigation").[110]

---

[107] Affidavit of Rahul K. Nath, M.D, attached as Exhibit 1 to Plaintiff's Response to Baylor's Motion for Summary Judgment).

[108] *See* Transcript of July 24, 2009 Hearing at 21, attached as Exhibit D to Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath; *see also* Letter from Bruce M. Flowers to Patrick W. Mizell dated June 26, 2009, at 7, attached as Exhibit A to Texas Children's Hospital's Response to Plaintiff's Supplemental Motion to Compel Dated July 20, 2009, filed July 23, 2009.

[109] Transcript of July 24, 2009 Hearing, at 16–17, 21, 48; Transcript of Jan. 21, 2010 Hearing, at 42–43, 51-52.

[110] This conduct is also an abuse of process as that term is defined in *Blackstock v. Tatum*, 396 S.W.2d 463, 468 (Tex. App.-Houston [1st Dist.] 1965, no writ) (quoting PROSSER ON TORTS, 3rd ed., § 115):

> The essential elements of abuse of process ... have been stated to be: first, an ulterior purpose, and second, a willful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort.

Because Nath's conduct is an abuse of process, sanctions are also appropriate under the Court's inherent authority. *See, e.g., Gilbert & Maxwell, PLLC v. Texas Mut. Ins. Co.*, 2008 WL 5264910 (Tex. App.-Austin Dec. 19, 2008).

65518170.6

34

: 00491

85) The Court also concludes that Nath's assertion of claims which he knew to be time-barred itself evidences bad faith and improper purpose. *Dolenz*, 197 S.W.3d at 422; *see also Campos*, 879 S.W.2d at 74 (refusing to find a time-barred claim was filed in good faith where the fact "[t]hat the applicable statute of limitations had run was well established").

86) When his declaratory judgment tactic failed, Nath's counsel immediately filed his Sixth Amended Petition, asserting his baseless IIED claim. The Court concludes that, given the timing and circumstances that surrounded the filing of the Sixth Amended Petition, it is clear that the IIED claim was a continuation of Nath's improper purposes and bad faith, harassing course of conduct. As discussed above, Nath only asserted his IIED claim after the parties fully briefed the motions for summary judgment that addressed the claims in the Fifth Amended Petition, and then only after he had successfully delayed the hearing on summary judgment by filing two recusal motions. Further, he did not even substantively respond to the summary judgment motions addressing his IIED claim, suggesting he never intended to prosecute the claim. A claim filed to delay a hearing is not filed in good faith or filed for a proper purpose. TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE § 10.001(1). Such conduct is, standing alone, sanctionable under Chapter 10. TEX. CIV. PRAC. & REM. CODE § 10.001(1) (allowing for sanctions where claim is brought for an improper purpose). It also evidences Nath's bad faith and harassing conduct, and warrants sanctions under Rule 13.

87) This Court recognizes that a party should not be punished for counsel's conduct unless the party is implicated apart from having entrusted its legal representation to counsel. *See, e.g., Glass v. Glass*, 826 S.W.2d 683, 687 (Tex. App.—Texarkana 1992, writ denied)

65518170.6

35

: 00492

94

(concluding that sanction of party was improper because "[n]owhere in its findings of fact did the trial court find that Peggy Glass did anything other than what her attorney did on her behalf" and "no evidence was adduced which tended to show that Peggy Glass did anything except rely on her attorney's advice"); *Bradt v. Sebek*, 14 S.W.3d 756, 769 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (noting that sanctioning of party was appropriate based on party's affidavit).[111] However, the both Rule 13 and Chapter 10 provide for sanctioning parties under appropriate circumstances. CPRC Section 10.004 states that a court that determines that a person has signed a pleading or motion in violation of Section 10.001 "may impose a sanction on the parson, *a party represented by the person*, or both." (emphasis added). Rule 13 likewise states that if a pleading, motion or other paper is signed in violation of the rule, the court "shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, *a represented party*, or both." (emphasis added). It is clear that sanctions may be appropriate "where the evidence…demonstrates that a party is at fault independent of the culpability of her attorney." *Parker v. Lancon*, 2002 WL 192371, at *2 (Tex. App.—Houston [14th Dist.] Feb. 7, 2002, pet. denied). As set forth above, this Court is sanctioning Nath for his improper purposes, and for his groundless pleadings that he brought in bad faith or to harass Baylor, all of which is conduct in which Nath took an active role.

---

[111] Plaintiff argues, citing to *Transamerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991), that the Court should determine what conduct is attributable to Nath's attorneys. *Transamerican* involved discovery sanctions under different rules of procedure, and is not applicable here. *See, e.g., Parker v. Lancon*, 2002 WL 192371, at *2 n.1 (Tex. App.—Houston [14th Dist.] Feb. 7, 2002) (stating that *Transamerican* did not apply to court's review of lower court's award of sanctions under Rule 13 for bad-faith litigation because "*Transamerican* involved discovery abuse," and "it can be particularly difficult to determine whether a party or her attorney is responsible for discovery abuse."). In any event, *Transamerican* affirms that "a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses." *Id.*

65518170.6

36

: 00493

*Baylor's Request for Sanctions Was Timely*

88)     Nath claimed, in opposing Baylor's Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath, that Baylor's request to modify the judgment to add sanctions was untimely. On September 10, 2010, this Court signed an order severing Baylor and Nath into this Severed Action, pursuant to Nath's request. This severance made the Court's June 18, 2010 summary judgment for Baylor final and appealable in the Severed Action. *See Pierce v. Reynolds*, 329 S.W.2d 76, 78-79, n.1 (Tex. 1959).

89)     On September 15, 2010, Nath filed a verified motion for a new trial in the Severed Action. As a result, the Court's plenary power was extended. TEX. R. CIV. P. 329b(e); *Lane Bank Equip. Co. v. Smith S. Equip. Co.*, 10 S.W.3d 308. 309-310 (Tex. 2000); *Scott & White Mem'l Hosp. v. Schexnider*, 940 S.W.2d 594, 596 (Tex. 1996). This Court thus had plenary power to modify its judgment, by adding sanctions, in the Severed Action until December 23, 2010, which is 105 days after September 10, 2010, the day the summary judgment for Baylor became final.

90)     Post-judgment sanctions are appropriate here because the sanctions are based on Nath's groundless pleadings that were in bad faith, and that lacked evidentiary support and were for an improper purpose. Plaintiff claims, citing to *Remington Arms Co. v. Caldwell*, 850 S.W.2d 167 (Tex. 1993), and *Finlay v. Olive*, 77 S.W.2d 520 (Tex. App.—Houston [1st Cir.] 2002, no pet.), that the sanctions were required to be assessed before the final judgment. *Remington* and *Finlay* are inapplicable here, as they involved discovery sanctions, rather than groundless bad faith filings or filings made for an improper purpose or without evidentiary support. *See Remington*, 850 S.W.2d at 170 (holding that "failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial

65518170.6

37

: 00494

constitutes a waiver of any claim for sanctions based on that conduct"); *Finlay*, 77 S.W.3d at 526 (noting that the postponement of "rulings on completed pre-trial [discovery] matters, where trial pleadings in the case are not at issue, and where trial testimony has no bearing on the sanctions dispute, would be to violate the very essence of *Remington Arms*"). Here, the Court had not made any conclusion that the claims in this lawsuit were groundless or lacked evidentiary support until it granted the motions for summary judgment. At that point, the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath based on those rulings was proper. There can be no question that sanctions for groundless filings brought in bad faith or for filings brought for an improper purpose or that lack evidentiary support may be awarded after the entry of a final judgment. *See Lane Bank*, 10 S.W.3d at 310-12; *Alpert*, 178 S.W.3d at 402-10.

*The Court, In its Discretion, Awards Sanctions of $644,500.16*

91)     As with the initial decision to impose sanctions, the trial court has broad discretion in determining the appropriate amount of sanctions. "The trial court's discretion is limited only by the requirement that its order be just and that the sanction imposed be specifically related to the harm done by the sanctioned conduct." *Attorney General*, 874 S.W.2d at 216. Both Rule 13 and Chapter 10 provide that a trial court may sanction the offending party in the amount of the expenses—including attorney's fees—incurred by the offended party. TEX. CIV. PRAC. & REM. CODE § 10.004(C)(3); TEX. R. CIV. P. 13, 215.2(b). Proof of the reasonableness and necessity of attorney's fees is not required when fees are assessed as sanctions. *Olibas v. Gomez*, 242 S.W.3d 527, 535 (Tex. App.—El Paso Aug. 23, 2007, pet. denied) (citing *JHC Ventures, L.P. v. Fast Trucking, Inc.*, 94 S.W.3d 762, 778 (Tex.

65518170.6

38

: 00495

97

App.—San Antonio 2002, no pet.) and *Gorman v. Gorman*, 966 S.W.2d 858, 868-69 (Tex. App.—Houston [1ˢᵗ Dist.] 1998, pet. denied)).

92) In determining the amount of sanctions, this Court has considered the factors listed in *Low v. Henry*, 221 S.W.3d at 620 & n.5. In light of Nath's groundless pleadings that he brought in bad faith, as set forth herein; Nath's lack of evidentiary support for his claims and his improper purposes, as set forth herein; Nath's knowledge of the law as a former legal student; Nath's prior conduct as a litigant in numerous cases; the expenses incurred by Baylor as a result of the litigation and their reasonable proportion to the amount Nath sought in damages; the relative culpability of Nath, as set forth above; the minimal risk of chilling legitimate litigation activity posed by sanctions here; Nath's ability to pay for the damages he has caused Baylor; the need for compensation to Baylor as a result of the damages inflicted upon it in defending against this lawsuit; the necessity of imposing a substantial sanction to curtail Nath's abuse of the judicial process and punish his bad faith and improper conduct; the burdens on the court system attributable to Nath's misconduct, including his consumption of extensive judicial time and resources in prosecuting this case; and the degree to which Nath's own behavior caused the expenses for which Baylor seeks reimbursement, the Court concludes that Baylor should be awarded a substantial portion of its attorney's fees to sanction Nath for his conduct.

93) As set forth above, Baylor claims that it has incurred $674,724.66 in attorney's fees in this case, and seeks sanctions in the amount of $644,500.16, which represents the attorney's fees it incurred in this case, excluding fees spent responding to Nath's motions to recuse and in prosecuting the Motion for Sanctions and Motion to Modify the Judgment to Assess Fees as Sanctions Against Plaintiff Rahul K. Nath. Nath attacks

65518170.6

39

: 00496

98

Baylor's fees affidavit as "attorney-fees hearsay" and not the best evidence. However, parties routinely submit affidavits to prove up fees and expenses. *See, e.g., Petroleum Analyzer Co. LP v. Olstowski*, No. 01-09-00076-CV, 2010 WL 2789016, at *23 (Tex. App.--Houston [1st Dist.] July 15, 2010, no pet.) (upholding award of attorney's fees based on affidavit provided by attorney); *Ramchandani v. Jimenez*, 314 S.W.3d 148, 154 (Tex. App.--Houston [14th Dist.] 2010, no pet.) (same); *see also Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 817 (Tex. App.--Houston [1st Dist.] 2008, no pet.) ("When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required.") (quoting *Miller v. Armogida*, 877 S.W.2d 361, 365 (Tex. App.--Houston [1st Dist.] 1994, writ denied)).[112]

94)     Nath argues that the Court's judicial notice of its own file in connection with the award of attorney's fees as sanctions is improper. The case Nath relies on involved an award of attorney's fees under a statutory provision that required that the fees be reasonable and necessary. *See London v. London*, 94 S.W.3d 139, 147-48 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (concluding that court was not authorized to take judicial notice of usual and customary fees and the contents of its file under C.P.R.C. Chapter 38 because that chapter did not apply to claims for child support). *London* is inapplicable because it did not involve fees assessed as sanctions and because, as discussed above, fees may be awarded as sanctions under Chapter 10 and Rule 13 without regard to their reasonableness.

---

[112] The Court concludes that, in providing the fees affidavit, Baylor did not imply that the Court's award of sanctions is limited to the amount of expenses and attorney's fees incurred. Rather, the amount of sanctions imposed is left to the discretion of the trial court. *See, e.g., Falk & Mayfield, L.L.P. v. Molzan*, 974 S.W.2d 821, 823-24 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) (noting that trial court may impose sanctions above and beyond amount of attorney's fees and expenses).

65518170.6

40

: 00497

99

95) Accordingly, the Court concludes that sanctions against Nath in the amount of $644,500.16, which represents a portion of the attorney's fees incurred by Baylor in defending against Nath's groundless claims that were in bad faith and harassing, and that lacked evidentiary support and were for an improper purpose, are appropriate.

SIGNED this _11_ day of January, 2011

JUDGE PRESIDING

65518170.6

41

: 00498

100